GOODIN, Appellant,

v.

COLUMBIA GAS OF OHIO, INC., Appellee, et al. ▮

[Cite as *Goodin v. Columbia Gas of Ohio, Inc.* (2000), 141 Ohio App.3d 207.]

Court of Appeals of Ohio,
Fourth District, Athens County.

No. 99 CA 30.

Decided March 13, 2000.

*Colley, Shroyer & Abraham Co. L.P.A., Michael F. Colley, Daniel N. Abraham* and *David K. Frank,* for appellant.

*Stephen L. Hebenstreit* and *Andrew J. Sonderman,* for appellee.

PETER B. ABELE, Judge.

This is an appeal from an Athens County Common Pleas Court summary judgment entered in favor of Columbia Gas of Ohio, Inc., defendant below and appellee herein.

Priscilla Goodin, individually and as administrator of the estate of Michael S. Sheroan, deceased, plaintiff below and appellant herein, raises the following assignments of error for review:

"First Assignment of Error:

"The trial court erred to the prejudice of appellant Priscilla Goodin in granting summary judgment in favor of Columbia Gas Of Ohio, Inc. ("Columbia Gas") and in dismissing her intentional tort claim against Columbia Gas since that company was not entitled to summary judgment under Civil Rule 56 because genuine issues of material fact were presented for determination by the jury."

"Second Assignment of Error:

"The trial court erred to the prejudice of appellant Priscilla Goodin in granting summary judgment in favor of Columbia Gas and in dismissing the appellant's intentional tort claim against Columbia Gas, since Columbia Gas was not entitled to judgment as a matter of law."

"Third Assignment of Error:

"The trial court's action in granting Columbia Gas' motion for summary judgment abridged the appellant's constitutional right to a jury trial guaranteed

by Article I, Section 5 of the Ohio Constitution and the Seventh Amendment to the U.S. Constitution."

"Fourth Assignment of Error:

"The trial court's action in granting Columbia Gas' motion for summary judgment abridged the appellant's constitutional right to a remedy and to justice guaranteed by Article I, Section 16 of the Ohio Constitution."

Our review of the record reveals the following facts pertinent to the instant appeal. On May 30, 1996, Columbia Gas employees Michael S. Sheroan and Jeff Gillogly were dispatched to 9 Riverview Drive in Athens, Ohio to check on a leaking curb valve. While attempting to replace the curb valve "on the fly" and without an oxygen monitor, both men apparently died of asphyxiation.

Changing a curb valve "on the fly" is a procedure in which Columbia Gas employees commonly engage. To change a valve "on the fly" is to change a valve with live natural gas flowing through the line. The process results in the employee being exposed to natural gas. One recognized hazard of exposure to natural gas is that it creates an oxygen deficient environment. While Columbia Gas safety personnel did not specifically approve of its employees changing valves "on the fly," Columbia Gas nevertheless knew that its employees commonly engaged in the process and did not prohibit or implement any policy advising employees to avoid changing valves "on the fly."

To alleviate the risk that an employee may be subjected to an oxygen deficient environment, Columbia Gas, beginning in 1995, required at least one member of a crew to have an oxygen monitor on his person prior to entering an excavation. The specific procedure, Number 445–4, stated: "When entering and working in excavations and trenches the following action shall be taken to provide adequate protection against serious physical harm * * * an approved oxygen monitor * * * shall be worn by one of the employees in the excavation." Columbia Gas specifically instructed its employees that anytime they entered an excavation that had a live gas line in it, at least one member of the crew must have an oxygen monitor.

An oxygen monitor plays an important role in determining whether sufficient oxygen is present in an excavation. The oxygen monitor would alert if the crew member encountered an oxygen deficient environment. If the oxygen monitor alerted, the employee had several options: the employee could "purge, ventilate the hole, make the hole bigger, [or] reposition [his or her] self."

The Athens area office of Columbia Gas assigned each senior fitter an oxygen monitor. The senior fitter often was assigned to work with a newer fitter. Gillogly, as a senior fitter, received an oxygen monitor. Because Columbia Gas apparently expected that Sheroan, who was not a senior fitter, would always be

part of a two-man crew that would include a senior fitter who would possess an oxygen monitor, Columbia Gas did not assign Sheroan an oxygen monitor.

In May of 1996, Sheroan and Gillogly were performing tasks as a two-man crew. In the early part of May, Gillogly informed his supervisor that he was having problems with his oxygen monitor. It was eventually determined that Gillogly's oxygen monitor needed to be repaired or replaced. Until Columbia Gas equipped Gillogly with either a repaired or a replaced oxygen monitor, William Allen, Gillogly's and Sheroan's supervisor, advised Gillogly that he would not be in possession of his own oxygen monitor.

James Lou Childress, the operations manager at the time of the incident, became aware that Gillogly's crew would not have an oxygen monitor. Childress testified that he informed Allen that until Gillogly's crew was issued an oxygen monitor, Allen should assign the crew jobs that would not require an oxygen monitor. Childress explained that plenty of work was available to Gillogly and Sheroan that did not require the use of an oxygen monitor. Childress also told Allen that "if [Gillogly and Sheroan] come into a situation where they need [an oxygen monitor] they should call for back up or call for somebody to come up that had one."

Allen stated that he told both Gillogly and Sheroan "numerous" times that they were not to perform tasks that required the use of an oxygen monitor, unless they had an oxygen monitor available. In his deposition, he stated that he "wouldn't have them work in an excavation with a live gas line without [an oxygen monitor]." Allen informed both men that if they encountered a situation that required the use of an oxygen monitor, they should contact another crew or the dispatcher to determine whether they could borrow an oxygen monitor. Allen further stated that he informed Gillogly that "if [Gillogly and Sheroan] entered a situation he was to get [an oxygen monitor] or back off and do something different. He ha[d] an alternative."

On May 30, 1996, Allen, aware that Gillogly's crew did not have an oxygen monitor in its possession, dispatched Gillogly and Sheroan to 9 Riverview Drive to check on a curb valve leak. Allen testified that when he dispatched the two men to the site, he did not know whether the situation would require an oxygen monitor. Allen explained that he did not know whether the situation would require an oxygen monitor, because Gillogly and Sheroan had at least two methods available to them at the time and location of their deaths that would not have required the use of the oxygen monitor. Allen admitted that replacing the valve would expose the men to natural gas, but he asserted that replacing the valve was only one of the options available to the two men. Allen did not, however, explain what other options were available. He further stated that he

would not recommend that a crew be sent to work at a site containing a live gas line without an oxygen monitor.

Exactly what happened when Gillogly and Sheroan arrived at the site is unknown. Apparently, however, the two men entered the excavation without an oxygen monitor and attempted to change a valve "on the fly," resulting in their deaths.

On May 29, 1997,[1] appellant filed a complaint alleging, *inter alia,* that appellee committed an intentional tort against decedent.[2] Appellee filed an answer denying liability.

On September 18, 1998, appellee filed a motion for summary judgment. Appellant opposed appellee's motion, and on May 26, 1999, the trial court granted appellee's motion for summary judgment. Appellant filed a timely notice of appeal.

## I

Appellant's first and second assignments of error both address the propriety of the trial court's decision granting summary judgment. We therefore will address the two related assignments of error together.

In her first and second assignments of error, appellant complains that the trial court erred by granting summary judgment in appellee's favor. Specifically, appellant contends that genuine issues of material fact remain for resolution at trial as to whether she established the elements required to maintain an action against an employer for an intentional tort. Appellee contends that the trial court properly determined that no genuine issues of material fact remained regarding appellant's intentional tort claim.

### A. STANDARD OF REVIEW

When reviewing a trial court's decision regarding a motion for summary judgment, an appellate court conducts a *de novo* review. See, *e.g., Grafton v.*

---

1. We note that when appellant filed the complaint, R.C. 2475.01 applied. During the pendency of the trial court proceedings, however, the Ohio Supreme Court declared R.C. 2475.01 unconstitutional. *Johnson v. BP Chemicals, Inc.* (1999), 85 Ohio St.3d 298, 707 N.E.2d 1107.

2. Appellant asserted (1) violations of the safe place to work statutes, R.C. 4101.11 and 4101.12; (2) violation of Section 192.13(c), Title 49, C.F.R.; and (3) a claim for wrongful death. Because the workers' compensation provisions set forth in R.C. Chapter 4123 generally govern the method of recovery for injury suffered in the employment relationship, we believe that all of appellant's claims for relief are superseded by and dependent upon whether the standard for an employer intentional tort has been met. See, generally, *Blankenship v. Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572.

*Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245. Accordingly, an appellate court must independently review the record to determine if summary judgment was appropriate and need not defer to the trial court's decision. See *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157; *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411–412, 599 N.E.2d 786, 788. In determining whether a trial court properly granted a motion for summary judgment, an appellate court must review the standard for granting a motion for summary judgment as set forth in Civ.R. 56, as well as the applicable law.

Civ.R. 56(C) provides, in relevant part, as follows:

"* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

Thus, a trial court may not grant a motion for summary judgment unless the evidence before the court demonstrates that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. See, *e.g.*, *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429–430, 674 N.E.2d 1164, 1171.

In responding to a motion for summary judgment, the nonmoving party may not rest on "unsupported allegations in the pleadings." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. Rather, Civ.R. 56 requires the nonmoving party to respond with competent evidence that demonstrates the existence of a genuine issue of material fact. Specifically, Civ.R. 56(E) provides:

"* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is

a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."

Consequently, once the moving party satisfies its Civ.R. 56 burden, the nonmoving party must demonstrate, by affidavit or by producing evidence of the type listed in Civ.R. 56(C), that a genuine issue of material fact remains for trial. A trial court may grant a properly supported motion for summary judgment if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that there is a genuine issue for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264; *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027, 1031.

When reviewing a motion for summary judgment, a court must construe all reasonable inferences that can be drawn from the evidentiary materials in a light most favorable to the nonmoving party. See, *e.g., Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485, 696 N.E.2d 1044, 1046; *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123, 1127. Moreover, a court must take care not "to consider either 'the quantum' or the 'superior credibility' of evidence." *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 242, 659 N.E.2d 317, 321. As we stated in *McGee,* 103 Ohio App.3d at 242–243, 659 N.E.2d at 321:

"The purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist. * * * Thus, a court should not pass upon the credibility of witnesses or weigh the relative value of their testimony in rendering summary judgment." (Citation omitted.)

In order to withstand a properly supported summary judgment motion in an employer intentional tort action, an employee "must set forth specific facts to raise a genuine issue of fact that the employer committed an intentional tort." *Hannah,* 82 Ohio St.3d at 485, 696 N.E.2d at 1046, citing *Van Fossen v. Babcock & Wilcox* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph seven of the syllabus. The employee may establish the elements of an intentional tort by direct or circumstantial evidence. *Hannah,* 82 Ohio St.3d at 485, 696 N.E.2d at 1046, citing *Adams v. Aluchem, Inc.* (1992), 78 Ohio App.3d 261, 264, 604 N.E.2d 254, 256.

## B. INTENTIONAL TORT

Although the workers' compensation provisions provide employees with the primary means of compensation for injury suffered in the scope of employment, an employee may institute a tort action against the employer when the employer's conduct is sufficiently "egregious" to constitute an intentional tort. See *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114,

1117; see, also, *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 484, 696 N.E.2d 1044, 1045; *Van Fossen*, 36 Ohio St.3d at 115, 522 N.E.2d at 503 (stating that the ultimate question in an intentional tort case is " 'what level of risk-exposure is so egregious as to constitute an "intentional wrong" ' ") (quoting *Millison v. E.I. du Pont de Nemours & Co.* (1985), 101 N.J. 161, 177, 501 A.2d 505, 514); *Blankenship v. Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572; *Blanton v. Internatl. Minerals & Chem. Corp.* (1997), 125 Ohio App.3d 22, 25, 707 N.E.2d 960, 962. When an employer's conduct is sufficiently egregious to constitute an intentional tort, it is said that the employer's act occurs outside the scope of employment, and, thus, recovery is not limited to the workers' compensation provisions. See *Blankenship*, 69 Ohio St.2d at 613, 23 O.O.3d at 507–508, 433 N.E.2d at 576, n. 7.

"[A]n intentional tort is 'an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur.' " *Hannah*, 82 Ohio St.3d at 484, 696 N.E.2d at 1046, quoting *Jones v. VIP Dev. Co.* (1984), 15 Ohio St.3d 90, 15 OBR 246, 472 N.E.2d 1046, paragraph one of the syllabus. A successful employer intentional tort action requires the employee to establish three basic elements:

" '(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.' " *Hannah*, 82 Ohio St.3d at 484, 696 N.E.2d at 1046, quoting *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus.

In determining whether an employer's conduct is sufficiently egregious to constitute an intentional tort, courts must refrain from construing "intentional tort" too broadly. As the court stated in *Van Fossen*, 36 Ohio St.3d at 116, 522 N.E.2d at 504:

" '[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the [Workers' Compensation] Act is not circumvented simply because a known risk later blossoms into reality. * * *' " *Id.* quoting *Millison v. E.I. du Pont de Nemours & Co.* (1985), 101 N.J. 161, 178, 501 A.2d 505, 514. (Citation omitted.)

The court continued to explain that "intentional wrong" (or tort) should be construed narrowly so as not to subvert the purposes of the Workers' Compensation Act:

" '[I]f "intentional wrong" is interpreted too broadly, this single exception would swallow up the entire "exclusivity" provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease. Thus in setting an appropriate standard by which to measure an "intentional wrong," we are careful to keep an eye fixed on the obvious: the system of workers' compensation confronts head-on the unpleasant, even harsh, reality—but a reality nevertheless—that industry knowingly exposes workers to the risks of injury and disease.' " *Van Fossen*, 36 Ohio St.3d at 115–16, 522 N.E.2d at 503, quoting *Millison v. E.I. du Pont de Nemours & Co.* (1985), 101 N.J. 161, 177, 501 A.2d 505, 513.

In seeking to define "intentional tort," *Van Fossen* also recognized that although many employment situations involve obvious dangers incident to employment, not all such obvious risks will satisfy the intentional tort standard. The court stated:

"[I]n determining the level of 'risk exposure that will satisfy the 'intentional wrong' exception * * * [c]ourts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitled the employee to recover only under the Compensation Act?' " *Van Fossen*, 36 Ohio St.3d at 116, 522 N.E.2d at 503–504, quoting *Millison v. E.I. du Pont de Nemours & Co.* (1985), 101 N.J. 161, 178–79, 501 A.2d 505, 514.

Thus, *Van Fossen* clearly recognized that many employment situations involve obvious dangers incident to employment and that the purpose of the Workers' Compensation Act is to provide an employee with compensation for injury suffered by reason of a danger necessarily incident to his employment. An intentional tort action, conversely, allows an employee to recover for injuries suffered that are not caused by a danger necessarily incident to his employment. For example, operating dangerous machinery may be a necessary incident of an employment situation, but operating that dangerous machinery without proper safety mechanisms may not constitute a necessary incident of the employment. See *Fyffe*. In the former case, recovery likely could be had under the Workers' Compensation Act. In the latter case, recovery may be possible under the theory that the employer's conduct in failing to provide adequate safety mechanisms constituted an intentional tort.

For example, the Ohio Supreme Court concluded in *Fyffe* that an employee could maintain an intentional tort action against an employer who knowingly removed a safety guard from a conveyor belt. In *Fyffe*, the plaintiff, a sanitation employee at a plant, was injured while cleaning a conveyor belt. The plaintiff noticed a plastic object caught inside the conveyor belt and reached around the "fall guard," a device to protect persons from accidental contact with the conveyor system. The plaintiff alleged that the employer committed an intentional tort by requiring the plaintiff to clean the conveyor belt, while in operation, without assuring that adequate safety measures were taken.

In the case at bar, we agree with the trial court's conclusion that no genuine issues of material fact exists as to whether appellee committed an intentional tort. The record fails to reveal: (1) that appellee knew to a substantial certainty that decedent would suffer injury by entering an excavation containing live gas without an oxygen monitor, or (2) that appellee required decedent to enter the excavation containing live gas without an oxygen monitor. Rather, we believe that the record indicates that decedent's injury resulted from one of the harsh realities associated with industrial work and that in the instant case, the Workers' Compensation Act provides the remedy. See *Van Fossen*, 36 Ohio St.3d at 115–16, 522 N.E.2d at 503.

## 1. DANGEROUS PROCEDURE

The first element of *Fyffe* requires the employee to establish that the employer possessed knowledge of a dangerous process, procedure, instrumentality, or condition within its business operations. In the case at bar, both parties agree that a genuine issue of material fact remains regarding the first element. Both appellant and appellee appear to agree that entering an excavation containing live gas without an oxygen monitor is a dangerous procedure.[3] Consequently, our resolution of the instant appeal ultimately depends upon whether genuine issues of material fact remain regarding: (1) whether appellee possessed knowledge that injury to decedent was a substantial certainty if, through his employment, decedent was subjected to the above dangerous procedure, and (2) whether appellee, armed with knowledge of the dangerous procedure and with knowledge that performance of the dangerous procedure would be substantially certain to cause injury to decedent, required decedent to continue to perform the dangerous task.

---

3. We note that appellee seeks to limit its concession to the dangerous task of changing a valve on the fly without an oxygen monitor, as opposed to entering an excavation containing live gas with an oxygen monitor.

## 2. SUBSTANTIAL CERTAINTY

Appellant argues that the trial court improperly concluded that no genuine issue of material fact remained for resolution at trial regarding whether appellee possessed knowledge that harm to decedent would be a substantial certainty if decedent entered an excavation, changed a valve "on the fly," and did not have an oxygen monitor. Appellant asserts that evidence of five prior incidents involving employees who suffered various degrees of oxygen asphyxiation, ranging from minor headaches to hospitalization, sufficiently demonstrates a genuine issue of material fact remains disputed.

Moreover, appellant appears to assert that a subsequently withdrawn OSHA citation demonstrates that appellee knew to a substantial certainty that harm would result to decedent if he entered an excavation, changed a valve "on the fly," and did not possess an oxygen monitor. OSHA cited appellee for the following violation:

"The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees, in that, employees who were exposed to a gaseous environment had not been provided with appropriate monitoring devices for the work environment. * * * On May 30, 1996, at 9 Riverview Drive, Athens, Ohio, where a curb valve was being replaced on a live gas line, no oxygen monitor was provided thereby exposing employees to an inhalation hazard." [4]

Appellee argues that no genuine issue of material fact exists as to whether it knew that injury to decedent was a substantial certainty. Appellee asserts that while a few prior incidents involving exposure to oxygen-deficient environments appear in the record, those incidents occurred prior to April 1995, the time when appellee began requiring its employees to use oxygen monitors. Furthermore, appellee argues that evidence of prior similar incidents does not sufficiently demonstrate that harm to the employee will be a substantial certainty. Appellee also asserts that because decedent possessed a safer alternate method of performing the task, it could not have known to a substantial certainty that decedent would suffer injury.

Under the second prong of *Fyffe*, if the employer knows that the dangerous procedure is substantially certain to cause harm to the employee, intent is inferred.[5] See *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d

---

4. We note that appellee objects to any consideration of the OSHA citation. Because we do not believe that the OSHA citation demonstrates that appellee knew that injury to decedent was a substantial certainty, we find no harm in considering the evidence. See *infra*, at 223.

5. In *Patton v. J & H Reinforcing & Structural Erectors, Inc.* (Dec. 9, 1994), Scioto App. No. 93–CA–2194, unreported, 1994 WL 693929, we explained:

173, 175, 551 N.E.2d 962, 964 (stating that when the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result, then intent will be inferred); see, also, *Ailiff v. Mar-Bal, Inc.* (1990), 62 Ohio App.3d 232, 238, 575 N.E.2d 228, 232, motion to certify overruled, 56 Ohio St.3d 704, 564 N.E.2d 707. Thus, the employee need not illustrate that the employer subjectively intended "to accomplish the consequences." *Van Fossen*, 36 Ohio St.3d at 117, 522 N.E.2d at 504.

 An employee cannot, however, demonstrate the "substantial certainty" element simply by illustrating that the employer acted negligently or recklessly. *Hannah*, 82 Ohio St.3d at 484, 696 N.E.2d at 1046; *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph six of the syllabus. Rather, the employee must show that the employer's conduct was more than mere negligence or recklessness. In *Fyffe*, the court explained:

"To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." *Fyffe*, paragraph two of the syllabus.

The *Fyffe* court continued:

"* * * [A]cts of the employer that are termed a 'high risk' of harm, or 'where the risk is great,' could, in most instances, correctly be viewed as acts of recklessness. However, in a given instance, and within a certain fact pattern, such acts could equate to one that is substantially certain to result in harm to the employee, and reasonably raise a justiciable issue of an intentional tort." *Fyffe*, 59 Ohio St.3d at 117, 570 N.E.2d at 1111–1112.

The *Fyffe* court further recognized that "some industrial activities that involve a high risk of harm, or where the risk of harm is great, may reasonably

---

"[U]nder Ohio law, there are two distinct types of intentional tort. The first is where the employer's conduct achieves the exact result desired, *i.e.*, during a quarrel the employer hits the employee in the head with a wrench. In the second type of case, intent is imputed to the employer where it knows the conduct is substantially certain to cause a particular result, even if it is not desired, *i.e.*, employer subjects the employee to highly radioactive material without protective measures."

encompass situations that fall within the scope of an 'intentional tort.' " *Fyffe,* 59 Ohio St.3d at 117, 570 N.E.2d at 1111.

As several courts have noted, establishing that the employer's conduct was more than negligence or recklessness "is a difficult standard to meet." *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 246, 659 N.E.2d 317, 324. In *Emminger v. Motion Savers, Inc.* (1990), 60 Ohio App.3d 14, 17, 572 N.E.2d 257, 260, the court explained that proof that the employer knew to a substantial certainty that harm to the employee would result often must be demonstrated through circumstantial evidence and inferences drawn from the evidence. The court stated:

"Proof of the employer's intent * * * is by necessity a matter of circumstantial evidence and inferences drawn from alleged facts appearing in the depositions, affidavits and exhibits. Even with these facts construed most strongly in favor of the employee as required by Civ.R. 56, the proof of the employer's intent must still be more than negligence or recklessness." *Id.*

We note that "[p]rior accidents are probative of whether an employer knows that an injury is substantially certain to occur." *Taulbee v. Adience,* 120 Ohio App.3d 11, 20, 696 N.E.2d 625, 631; see, also, *Jones v. Gen. Motors Corp.* (May 9, 1997), Defiance App. No. 4–96–21, unreported, 1997 WL 232730 (213 prior similar incidents of which employer had knowledge creates triable issue of fact regarding whether injury to employee was substantially certain). But, see, *Heard v. United Parcel Serv.* (July 20, 1999), Franklin App. No. 98AP–1267, unreported, 1999 WL 814391 (stating that while evidence of prior accidents "indicates that such injuries will possibly or even likely occur in the future, it does not constitute a showing that [the employee's] injury was substantially certain to occur"). As explained in *Blanton v. Pine Creek Farms* (1995), 100 Ohio App.3d 677, 684, 654 N.E.2d 1027, 1031–1032:

"Where there is a one-time occurrence, or when the same event happens twice, the likelihood of the event becomes more palpable. If the event occurs, exactly as before, a third time, the result of the fourth occurrence can be reasonably anticipated. If it happens a fourth time, it approaches substantial certainty, and few would expect an outcome other than that which had just previously occurred."

Evidence of prior similar incidents, however, is not dispositive of whether the employer knew to a substantial certainty that injury would result from performing the dangerous task. Rather, "prior accidents are to be considered as one factor of knowledge that an injury is substantially certain to result * * *." *Taulbee,* 120 Ohio App.3d at 20, 696 N.E.2d at 631. Moreover, "the absence of prior accidents 'strongly suggests' that injury from the procedure was not

substantially certain to result from the manner in which the job was performed." *Taulbee*, 120 Ohio App.3d at 20, 696 N.E.2d at 631.

"Establishing the employer's knowledge of substantial certainty of harm is difficult where there are not prior accidents of a similar character, but a lack of prior accidents is not necessarily fatal to a plaintiff's case." *Id.* As the *Taulbee* court stated:

" 'Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of *Fyffe*.' " 120 Ohio App.3d at 20, 696 N.E.2d at 631, quoting *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417, 429–430, 657 N.E.2d 356, 364.

█ Thus, " 'in the final analysis, absent some other evidence indicating that injury is substantially certain to occur, such as a number of prior accidents resulting from the dangerous condition, a determination of substantial certainty turns in large part on the nature of the dangerous condition.' " *Taulbee*, 120 Ohio App.3d at 21, 696 N.E.2d at 631, quoting *Palk v. S.E. Johnson Companies* (Nov. 9, 1993), Franklin App. No. 93AP–573, unreported, 1993 WL 460602. Accordingly, in reviewing whether the employer knew that harm to the employee was a substantial certainty, courts should focus not only on the existence of prior similar incidents, but also "on the employer's knowledge of the degree of risk involved." *Taulbee*, 120 Ohio App.3d at 21, 696 N.E.2d at 631.

█ In the case at bar, appellant asserts that the five prior incidents in which employees suffered varying degrees of oxygen asphyxiation demonstrates that harm to decedent was a substantial certainty. We disagree. First, we note that all of the injuries to which appellant refers occurred prior to April 1995, the time when appellee began requiring its employees to wear oxygen monitors. Second, none of the employees suffered long-term, serious illness or death. Instead, the employees complained of minor discomforts, such as headaches. Additionally, it is undisputed that the procedure in which decedent had been engaged at the time of his death had been performed "hundreds" of times by other employees. We do not believe that five prior incidents of oxygen asphyxiation, none of which resulted in serious injury, raises a genuine issue of material fact as to whether appellee knew to a substantial certainty that death to decedent would occur. None of the prior incidents involved employees who died as a result of entering excavations containing live gas without an oxygen monitor to change a

valve on the fly. Furthermore, we disagree with appellee's assertion that evidence of prior similar accidents, by itself, is insufficient to demonstrate that the employer knew that injury to the employee was a substantial certainty. In a proper case, we believe that evidence of prior similar accidents may establish that the employer knew that injury to the employee was a substantial certainty.

Under the facts presented in the case *sub judice*, we believe that the trial court properly concluded that no genuine issue of material fact remained as to whether appellee knew to a substantial certainty that injury to decedent would occur. Because decedent had "alternate means of proceeding available to him," appellee could not have known to a substantial certainty that decedent would be subjected to a dangerous procedure and that harm resulting from that dangerous procedure would be a substantial certainty. Several courts have recognized that "[a]n employer cannot be expected to anticipate an employee's actions that lead to an injury where that employee has alternative means of proceeding available to him." *McConville v. Jackson Comfort Sys., Inc.* (1994), 95 Ohio App.3d 297, 303, 642 N.E.2d 416, 420.

In *McConville*, the plaintiff was an employee of Jackson and was working at a General Electric Company facility. The plaintiff and another Jackson employee were working from scaffolding, when the plaintiff became dizzy and fell. The plaintiff had not been using any safety equipment. The plaintiff alleged that he had been overcome by welding exhaust fumes from below. He claimed that although he detected the fumes, he did not put on the ventilation oxygen mask that was in his truck. The plaintiff filed an intentional tort complaint against Jackson, his employer. The plaintiff asserted that his employer knowingly ordered him to work thirty feet high on unsafe scaffolding, with no training, supervision, or safety equipment. The court concluded that intent could not be inferred on the part of the employer when the employee could have used a ventilation mask to alleviate the risk of harm.

Similarly, in *Foust v. Magnum Restaurants, Inc.* (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150, protective gear was available to the employee, but he did not use it. Moreover, no evidence existed in the record that the employer told the employee not to wear the equipment. *Id.*, 97 Ohio App.3d at 456, 646 N.E.2d at 1153. While evidence existed that the employee's supervisors "knew that the employees were not always wearing the equipment," the court concluded that the employer's "failure to ensure that the employees were, at all times, using the available safety equipment * * * f[e]ll short of the higher standard of substantial certainty." *Id.*, 97 Ohio App.3d at 456, 646 N.E.2d at 1154. The court concluded: "this is not a case in which the employer failed to provide any safety equipment despite knowledge of a dangerous procedure * * * [and][g]iven the availability of this protective clothing, it cannot be said that [the employer] knew to a substan-

tial certainty that an employee would be injured while [engaging in the dangerous process]." (Emphasis added.) *Id.*, 97 Ohio App.3d at 456, 646 N.E.2d at 1154.

Again, in *Baggs v. Clarklift of Columbus* (Apr. 9, 1996), Franklin App. No. 95APE11–1501, 1996 WL 166754, the plaintiff failed to proceed in a manner which would have minimized the risk of harm. The plaintiff, an experienced mechanic, alleged that the employer failed to provide adequate lighting and that the lack of lighting created a dangerous condition. The plaintiff was injured when he reached under a piece of machinery and was cut by a bent fan blade. The plaintiff alleged that if his employer had provided him with adequate lighting, he would have seen the bent fan blade and would not have been injured.

At the shop where the plaintiff worked, an overhead florescent light in the ceiling helped illuminate his work area. Each mechanic also had a drop light. The plaintiff normally used his drop light while working. The mechanics commonly experienced difficulty in getting replacement bulbs for the drop lights. On the day the plaintiff was injured, he did not have a bulb in his drop light. He had requested a bulb days earlier, but none were in stock. Evidence was submitted that when light bulbs were not available, mechanics would take the bulb out of the parts washer located in each mechanic's stall.

The court rejected the plaintiff's claim that his employer committed an intentional tort by failing to provide him with adequate lighting. Like the *McConville* court, the court concluded that because the plaintiff could have used a safer alternative to accomplish his task, the employer could not be charged with knowing, to a substantial certainty, that injury would occur. The court stated:

"[The plaintiff] was an experienced mechanic who was performing a routine inspection. He chose to perform the task in the manner in which he did. * * * Appellee did not require [plaintiff] to use his hand directly to move the governor lever. [Plaintiff] could have borrowed another drop light, and there was no evidence that appellee required [plaintiff] to perform the inspection without a drop light."[6]

The court further noted: "While it may be foreseeable that a chronic lack of light bulbs may eventually result in injury to an employee, this does not constitute substantial certainty."

■ We find the reasoning stated in *McConville, Foust,* and *Baggs* applicable to the case at bar. Like the employees in all three cases, decedent possessed a safer alternative to accomplish his task. Decedent's supervisor testified that Gillogly and the decedent could have called for back-up to provide them with an

---

6. We also note that the *Baggs* court seems to imply that the injured employee's failure to utilize a safer means of performing the task may be relevant under the third prong of *Fyffe.*

oxygen monitor. Decedent's supervisor further stated that decedent was warned numerous times not to enter an excavation containing live gas unless at least one member of the crew had an oxygen monitor. Under the above circumstances, we simply cannot charge appellee with knowing that injury to decedent was a substantial certainty. We believe that appellee was entitled to believe that decedent would follow standard safety procedures. Appellee may have known of some risk that decedent would enter an excavation containing live gas to change a valve without his oxygen monitor and suffer injury. Knowledge of some risk, however, falls far short of knowledge to a substantial certainty. See *Foust, supra; Baggs, supra.*

Moreover, we note that simply because an employer "uses a dangerous instrumentality in its business operations does not create the substantial certainty of injury necessary to meet the second element of *Fyffe*." *Heard v. United Parcel Serv.* (July 20, 1999), Franklin App. No. 98AP–1267, unreported, 1999 WL 814391, citing *Van Fossen, supra.* The *Heard* court stated: " '[E]xposure to hazardous or unusually dangerous conditions or processes is insufficient by itself to constitute a basis for bringing an intentional tort claim against an employer.' " *Heard* quoting *Youngbird v. Whirlpool Corp.* (1994), 99 Ohio App.3d 740, 745, 651 N.E.2d 1314, 1317. Thus, in the case at bar, simply because appellee may have known that its employees often engaged in the process of changing valves on the fly does not necessarily give rise to an intentional tort claim. Rather, it is a fact of industrial life that workers may be exposed to hazardous and dangerous conditions through their employment. To that end, the Workers' Compensation Act provides recovery to the injured employee. As the court stated in *Van Fossen*, 36 Ohio St.3d at 117, 522 N.E.2d at 504:

"There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized by gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort.' * * *"

We further find unpersuasive appellant's argument that the withdrawn OSHA citation provides evidence that appellee knew that injury to decedent was a substantial certainty. In *Maddox v. L.O. Warner, Inc.* (Feb. 7, 1996), Montgomery App. No. 15468, unreported, 1996 WL 50152, a similar argument was raised and rejected.

In *Maddox*, the plaintiff argued that a genuine issue remained as to whether the employer knew that the decedent's death was substantially certain based upon OSHA violations for which company was cited. Evidence was submitted

that OSHA cited the employer for its "failure to establish written standard operating procedures for the use of respirators or the control of potentially hazardous energy, the failure of its employee to purge a refrigerant pipeline before brazing, and its failure to train employees on the health hazards associated with work-related chemicals." The court concluded that the OSHA violations may raise a genuine issue of material fact as to whether the employer was negligent, but that such evidence was insufficient to help demonstrate that injury was a substantial certainty.

Similarly, in the case at bar, the withdrawn OSHA citation may help establish that appellee's conduct was negligent, perhaps even reckless. The OSHA citation, by itself, however, is insufficient to illustrate that injury to decedent was a substantial certainty.

Thus, based upon the foregoing reasons, we find no genuine issue of material fact as to whether appellee knew that injury to decedent was a substantial certainty. This is not a case in which the employer utterly failed to institute and maintain safety procedures, despite knowing of a dangerous process. See, generally, *Russell v. Interim Personnel, Inc.* (1999), 135 Ohio App.3d 301, 733 N.E.2d 1186. Rather, appellee trained its employees on safety procedures and had a written policy requiring employees to use oxygen monitors in excavations containing live gas. Unfortunately, decedent, for a reason which may never be known, entered the excavation without an oxygen monitor.

Although it is not far-fetched to suggest that appellee knew that some injury to decedent was likely, we do not believe that under the facts of the case at bar, appellee knew that decedent would enter the excavation without an oxygen monitor and suffer fatal injury. Instead, we believe that appellee was entitled to assume that decedent would follow the safety procedures that appellee had instituted to minimize the risk that workers would be exposed to oxygen deficient environments. Had the decedent employed the proper safety procedure, the accident may not have occurred.

### 3. REQUIRED THE EMPLOYEE TO PERFORM THE DANGEROUS TASK

Assuming, *arguendo*, that a genuine issue of material fact remains regarding whether appellee knew that injury to decedent was a substantial certainty, we agree with the trial court's conclusion that no genuine issue of material fact exists as to whether appellee required decedent to enter the excavation containing live gas without an oxygen monitor to change the valve.

Appellant argues that genuine issues remain because appellee dispatched decedent to the location knowing that decedent did not have an oxygen monitor

and knowing that decedent would be exposed to gas. Appellant asserts that because Gillogly was the lead man on the job, a reasonable jury could infer that Gillogly directed decedent to change the valve on the fly without the oxygen monitor.

Appellant also contends that because appellee knew its employees commonly changed valves on the fly, appellee should have known that decedent would engage in the practice and thus, appellee should have known that an oxygen monitor would be required. Appellant argues that appellee, charged with this knowledge, sent decedent to a job site that appellee should have known would require the use of an oxygen monitor, while knowing that the crew on which decedent was working did not have an oxygen monitor. Thus, given the foregoing, appellant asserts that a reasonable inference exists that appellee required decedent to perform the task.

Appellee, on the other hand, asserts that the trial court correctly found that absolutely no evidence exists to demonstrate that appellee required decedent to proceed with a dangerous task. Rather, appellee asserts, the record aptly demonstrates that appellee specifically informed appellant's decedent not to proceed with a task that required the use of an oxygen monitor without an oxygen monitor. Appellee notes that the evidence illustrates that decedent and the senior fitter, Gillogly, were told that if they encountered a situation requiring an oxygen monitor, they were to call for back up or to call for someone to bring them an oxygen monitor. Appellee further notes that Gillogly's and decedent's supervisor had no way of knowing, when he dispatched the two to the site, whether an oxygen monitor would be required. Appellee asserts that Gillogly and decedent were not required to change the valve "on the fly," and that an oxygen monitor would have been available for their use, had they called the dispatcher as instructed.

In *Hannah*, the court considered whether a genuine issue of material fact remained regarding whether the employer acted to require the employee to perform the dangerous task. In *Hannah*, the injured employee was a member of the rescue squad team at Dayton Power and Light Company's ("DP & L") plant. On the date of the employee's injury, he climbed a ladder in an effort to rescue an individual from a platform approximately four hundred fifty feet high. The individual had been stranded at that level when the elevator inside the smokestack became stuck. The employee attempted to restart the elevator inside the extremely hot environment of the smokestack. The intense heat overcame the employee and he aborted the attempt to fix the elevator. The employee went down to the platform where he collapsed and was unable to be revived.

Evidence was submitted that the smokestack elevator had malfunctioned on prior occasions, and yet the rescue team had never received training on how to

respond to such an emergency. DP & L was aware that the rescue team had minimal training in vertical rescues. Moreover, the rescue team members received no training at platform levels inside the stack or at any level over one hundred feet. The injured employee, two years before the accident, had sent a letter to DP & L management resigning from the rescue squad due to his belief that he did not have adequate training. DP & L did not subsequently provide additional training.

In light of the foregoing evidence, the Ohio Supreme Court concluded that a genuine issue of material fact remained regarding whether DP & L required the employee to perform the dangerous task. The court noted that it was not necessary to establish that DP & L expressly had ordered the employee to climb the ladder and perform the rescue. Rather, the court found the former plant manager's testimony that DP & L expected the rescue squad to respond to an emergency and to perform the rescue in a safe manner raised an inference that DP & L required decedent to perform rescue. The court stated:

"[U]nder the third element of *Fyffe*, DP & L did not have to expressly order the decedent to make the rescue. Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through it actions and policies, required the decedent to engage in that dangerous task." 82 Ohio St.3d at 487, 696 N.E.2d at 1048.

In *Streb v. AMF Bowling Centers, Inc.* (Apr. 30, 1998), Franklin App. No. 97APE06-752, unreported, 1998 WL 212619, the court found no genuine issues regarding whether the employer required the injured employee to perform the dangerous task, when the evidence demonstrated that the employer had specifically informed the employee not to perform the dangerous task. In *Streb*, the decedent worked at a bowling alley as a "pinchaser." The decedent's duties included clearing pin jams, re-spotting the pins, clearing the balls that become lodged in the ball return, cleaning machines, and performing minor non-mechanical and non-electrical repairs. Each lane at the alley was equipped with a pinspotter, an automatic, electrical machine that sets the pins on the bowling lane following each play. The pinchasers kept a daily sheet to record any machine malfunctions. One of the decedent's co-workers recognized a problem with one of the lanes and disconnected the electricity to the pinspotter. He noted the problem on the daily sheet and left a note for the decedent. The note stated, "Roy, Lane 30# is down. Don't call me."

When the decedent arrived at work the following morning he found the note. The decedent then spoke with two other employees about the note and indicated a desire to repair the pinspotter. Both employees told the decedent that lane 30 would not be needed that day. Both employees further advised the decedent to

leave the pinspotter alone because he was not authorized to work on the machines. Moreover, evidence was submitted that the decedent's original supervisor and his supervisor at the time of the accident, both head mechanics, had instructed decedent never to attempt any electrical repairs on the pinspotters. The decedent apparently disregarded the advice of the two employees and the warnings of his supervisors and was electrocuted while attempting to repair the pinspotter.

Because the employee disregarded the employer's explicit warnings, both the court of appeals and the trial court found no genuine issues remained regarding whether employer acted to require the decedent to perform the dangerous task. See, also, *England v. A.K. Steel Co.* (Sept. 3, 1996), Butler App. No. CA96–05–099, unreported, 1996 WL 494830 (disregarding employer's suggestions not to perform certain task negates claim that employer required employee to perform task).

In *Maddox v. L.O. Warner, Inc.* (Feb. 7, 1996), Montgomery App. No. 15468, unreported, 1996 WL 50152, the court found no genuine issues regarding whether the employer required the employee to perform the task when the employee failed to follow accepted safety procedures. The employee was the installation supervisor for Warner, where he had been an employee for six years. At the time of the employee's injury, he was repairing a previously-installed chiller system at Ford Motor Company's plant. Ford had reported a Freon leak in the system and Maddox was sent to repair the leak.

. While working at the plant, Ford employee Gary Weiging was assigned to assist the employee. Weiging observed the employee using a halide leak detector to test the system for the presence of a Freon leak. Weiging saw a yellow flame in the halide detector turn green, indicating the presence of Freon on the outside of the piping.

Freon decomposes to phosgene gas, a poisonous and often lethal gas, when exposed to a flame. Because of the risks associated with phosgene gas, the accepted procedure for repairing leaks in pipes containing Freon is to evacuate and purge the pipes before soldering or brazing. The employee proceeded to solder and braze the pipes in the system without evacuating or purging the lines, despite indications that Freon was present. The employee was not equipped with a respirator and did not request one to complete the job.

Weiging testified that he saw the flame on the employee's torch turn green twice while the employee attempted to repair leak. Weiging stated that the employee would turn his head away and comment on the nasty smell. The employee subsequently died from exposure to the gas.

The court concluded that no genuine issues of material fact existed as to whether the employer required the employee to perform the dangerous task. The court noted that the employee was aware that phosgene gas is a dangerous byproduct of Freon, but he did not protect himself from that danger by purging the refrigerant line before brazing. The court also noted that the decedent had received training, completed qualification testing, and viewed a video regarding OSHA standards. Additionally, the employer stated that no one at the company had ever instructed or encouraged the decedent to braze a refrigerant line without first evacuating or purging the line.

In *Crissinger v. Turn–All Machine & Gear Co.* (May 7, 1999), Clark App. No. 98–CA–108, unreported, 1999 WL 279514, the court also concluded that no genuine issues of material fact remained when the evidence demonstrated that the employee had disregarded the employer's safety procedure. In *Crissinger*, the employee injured her hand on a piece of machinery. The employee had been wearing both rubber gloves and canvas gloves when she injured her hand. The employee stated that she had asked her supervisor for canvas gloves and that he gave her some. The employee also stated that she had told her supervisor that she could not perform her work without the canvas gloves.

The employee claimed that she wore the gloves because the gloves provided her with a better grip and prevented her from getting cuts and scratches. Another employee suggested that she not wear the gloves while performing her work. The other employee stated that it was dangerous to perform the work wearing the canvas gloves because the gloves might become entangled in the machinery. The employee's supervisor also advised the employees not to wear gloves, although he was aware that some employees wore gloves. The supervisor stated that he did not stop the employees from wearing gloves and would provide them with gloves if they asked. Additionally, the owner of the company indicated that he did not want the employees to wear gloves while operating the machinery.

The employee stated that on the day of the accident, she told another employee that she was "leery" of using the machine because another employee had been injured a few days earlier. The employee also claimed that she would have been required to perform the work even if she had objected. The employee's supervisor, however, stated that had she objected, he would have found her other work.

The court found that the employer did not require the employee to perform the dangerous task, because the employee was not required to wear the gloves while performing her work and because the employee was cautioned against wearing gloves. The court stated: "There is no evidence to suggest that the accident would have occurred had she followed company policy and her training."

Unlike *Hannah,* in the case at bar, no inference exists that appellee, through its actions and policies, required decedent to engage in the task of changing a valve on the fly without an oxygen monitor. Rather, the case at bar more closely resembles *Maddox, Crissinger,* and *Streb.* Like all three cases, the evidence in the case at bar demonstrates that appellee expressly warned decedent not to enter a site that required the use of an oxygen monitor unless at least one member of the crew had an oxygen monitor. Appellant asks us to infer, however, that because Gillogly was the senior member of the crew, he required decedent to enter excavation without an oxygen monitor. We cannot do so. Simply because Allen stated that fitters rely upon senior fitters for instruction and guidance does not lead to the inference that the senior fitters require subordinate fitters to perform the task. We note that Allen stated that decedent was personally advised not to enter an excavation containing live gas unless at least one member of the crew wore an oxygen monitor. Moreover, decedent received standard training on the proper use of oxygen monitors.

Moreover, we believe *Hannah* is distinguishable from the case at bar. In *Hannah,* the injured employee had no alternative method to performing the rescue available. In the case *sub judice,* decedent possessed alternate means to perform task. Like the injured employees in *Maddox, Crissinger,* and *Streb,* decedent disregarded standard safety procedures and express warnings from his employer. Given this circumstance, we simply cannot conclude that appellee required decedent to change a valve on the fly without an oxygen monitor.

Moreover, we reject appellant's argument that appellee "should have known" that decedent would encounter a situation requiring the use of an oxygen monitor. Such an argument sounds in negligence and is insufficient to satisfy the intentional tort standard. Cf. *Naragon v. Dayton Power & Light Co.* (Mar. 30, 1998), Shelby App. No. 17–97–21, unreported, 1998 WL 142386 (stating that alleging what employer "'should have known' is a negligence inquiry" and is insufficient to establish an intentional tort).

Accordingly, based upon the foregoing reasons, we overrule appellant's first and second assignments of error.

## II

In his third and fourth assignment of errors, appellant contends that the summary judgment procedure somehow violates his right to a trial by jury and his "right to a remedy and to justice." We find no merit to appellant's arguments.

In *Dupler v. Mansfield Journal Co., Inc.* (1980), 64 Ohio St.2d 116, 120, 18 O.O.3d 354, 356–357, 413 N.E.2d 1187, 1191, the court explained:

"Summary judgment is admittedly 'a drastic device since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.' *Heyman v. Commerce and Industry Ins. Co.* (C.A.2, 1975), 524 F.2d 1317, 1320. However, courts have not hesitated to grant such a motion where 'it is plain that the record has been fully developed by depositions and affidavits * * * and such record demonstrates that, construing all the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand * * *.' *Time, Inc. v. McLaney* (C.A.5, 1969), 406 F.2d 565, 572. n. 3."

Summary judgment is an accepted procedure for resolving cases in which no material facts remain disputed. See Civ.R. 56. The Rules of Civil Procedure expressly authorize the summary judgment procedure, and the Ohio Supreme Court consistently has sanctioned the procedure. See, *e.g., Vahila, supra; Dresher, supra.* The rule helps to promote judicial economy by "unclogging [from] courts' dockets * * * lawsuits which do not present substantial questions for determination at trial." *Stibora v. Greater Cleveland Bowling Assoc.* (1989), 63 Ohio App.3d 107, 112, 577 N.E.2d 1175, 1178.

We discern no reason why this court should disregard an accepted procedure for judicious resolution of cases and conclude that summary judgment violates a litigant's right to a remedy or to a jury trial. Such a result clearly would be contrary to the well-established principles of summary judgment procedure.

Accordingly, based upon the foregoing reasons, we overrule appellant's third and fourth assignments of error and affirm the trial court's judgment.

*Judgment affirmed.*

KLINE, P.J., and EVANS, J., concur.