**Ailiff**
v.
**Mar-Bal, Inc.**
*[Cite as 4 AOA 497]*

*Case No. 88-G-1491*
*Geauga County, (11th)*
*Decided June 22, 1990*

*Robert D. Gary, Jori Bloom Naegele, Thomas R. Theado, 446 Broadway, Lorain, Ohio 44052-1797, for Plaintiffs-Appellants.*

*Richard J. McGraw, Robert E. Blackham, Mansour, Gavin, Gerlack & Manos Co., The Illuminating Building, 55 Public Square, Suite 1150, Cleveland, Ohio 44113-1994, for Defendant-Appellee.*

FORD J.

This appeal stems from an intentional tort action filed by appellants William Ailiff, Donald Ailiff, Maralyn Ailiff and the estate of Frank Ailiff (who died in an unrelated automobile accident after the commencement of suit) against appellee, Mar-Bal, Inc. All four appellants were employees of appellee, although Maralyn Ailiff's claim is for loss of consortium based on injuries incurred by her husband, William. (William Ailiff is the father of Donald Ailiff and was the uncle of Frank).

Appellants' suit alleged that appellee exposed them to excessive amounts of methylene chloride, despite a "substantial certainty" that an injury would result from this contact. Appellee filed a motion for summary judgment against appellants which was denied by the trial court on June 4, 1988. This cause went to trial on October 31, 1988. At the close of the appellants' case,

appellee moved for directed verdict, which was granted by the trial court.

Appellee is in the business of manufacturing plastics. As the various batches of plastic came in different colors, it is essential for appellee to keep all of its instruments clean, so that the color production is precise. In order to achieve this precision, appellee's employees cleaned all of the company's equipment with methylene chloride.

Methylene chloride is a chemical solvent that was used as a degreaser, as well as a paint thinner. It evaporates at room temperature, if left in open containers, but, because the gas is heavier than air, it stays in the workplace, near the floor. The National Institute of Occupational Safety and Health (NIOSH) threshold limit value (TLV) ceiling for an eight hour work shift was 75 Parts Per Million (PPM). The Occupational Safety and Health Administration (OSHA, the enforcement arm of NIOSH), used a higher TLV of 500 PPM. According to appellee's chemist, methylene chloride, when breathed in high concentrations, can cause dizziness, lightheadedness, headaches, and, in high concentrations, coma and death. Apparently, when metabolized by the body, methylene chloride breaks down to become carbon monoxide, which bonds with hemoglobin going to the brain, causing brain injury. Additionally, methylene chloride can be absorbed through skin contact, causing a contact dermatitis, as well as the aforementioned injuries.

During all times relevant to this suit, when appellee's employees cleaned mixers, they were required to pour five to ten gallons of the chemical into mixing bowl and turn the machine on for agitation. The agitation process lasted from ten to forty-five minutes. The workers remained in the area while the machine was agitating. Following the agitation cycle, the employee had to reach into the mixer with a rag and scour the interior of the mixing bowl. This task required the cleaner to bend down into and place his head in the mixing bowl containing the methylene chloride.

The remainder of appellee's equipment was cleaned by wiping the various pieces of machinery with rags, soaked with the chemical which was carried in buckets by the employees. These rags were used until filthy, at which point they were simply thrown away. The methylene chloride itself remained either in the large 55 gallon drums or in the smaller uncovered cleaning buckets carried by employees until it evaporated or otherwise became depleted. Moreover, the employees, apparently at management's direction, utilized methylene chloride to wash the various resins off their own hands, several times a day.

Appellee's president, Jim Balogh, and its chemist, Arthur Busler, were well acquainted with the dangers of methylene chloride; Busler through working with the solvent since the early 1950s and seeing its toxic effects; Balogh through a wide reading of the available literature on the chemical. Additionally, the company was provided with material status data sheets (MSDS) for the chemical, which described the solvent's toxic properties, governmental regulations, and safety precautions to be taken when using methylene chloride. These precautions included maximum exposure times, special safety equipment needed for safe interaction with the chemical (splash resistant goggles, a self contained breathing apparatus, neoprene gloves), and safety precautions to be taken while working with methylene chloride. Each MSDS warned that misuse of the chemical could cause serious injury as well as enumerating some of the symptoms of overexposure.

There is considerable testimony that indicates that appellee did not follow the safety regulations. A host of employees testified that they never received goggles or a respirator, or, if a respirator was provided, that it was either a white cotton mask, or, in some instances, a carbon filter respirator which was not suited for working with the chemical. The employees further stated that the only gloves available were white cotton, utilized generally for protection against the heat of the equipment. There appears to be consensus among the employees that neoprene gloves were never provided by appellee.

Both Balogh and Busler testified that they felt that it would be a bad idea to allow methylene chloride to evaporate in the factory, and Balogh specifically stated that he would not have wanted his employees to wash their hands with the chemical. Yet, although Balogh noted that evaporation of the chemical would be "dangerous", over 35,000 pounds of methylene chloride evaporated in appellee's plant. Moreover, despite the fact that Balogh would not have wanted his employees washing their hands with a solvent like methylene chloride, his employees did so several times a day, apparently at the instruction of their supervisors.

The record indicates that appellee's employees suffered from a rash of ailments which could be traceable to the methylene chloride. These

ailments included headaches so frequent that the employees were finally told to purchase their own aspirin. The record indicates that two of appellee's employees collapsed at work, one inside a mixer and one in the personnel office. There are some allegations in the record that OSHA logs were falsified to cover up these incidents. [The employees' renditions of these accidents varies somewhat from that provided by the appellee].

There is some question as to whether questions about the safety of methylene chloride were ever raised by the employees. There was testimony, however, which indicates that the issue was raised at a safety committee meeting and not answered. Employees who questioned their foremen about the effect of methylene chloride on their hands (which turned cold and tingly) were told that the chemical was "as safe as water". Further, one safety committee member stated that all committee members were barred from the mixing area. Several employees testified that, prior to inspection by fire or insurance agents, the plant would be scrupulously cleaned and all chemicals removed outside.

No test of the air quality of the plant was undertaken until after the commencement of this lawsuit, so it is impossible to deduce the PPM of methylene chloride in the air during the appellants' tenures. Tests taken, after appellee improved the plant's ventilation subsequent to the filing of appellants' suit, which were allegedly intended to replicate the working conditions during the appellants' tenures with the company, indicated levels of methylene chloride substantially above the OSHA limit.

Appellants worked for appellee during the early 1980s William from 1981-1982, and again from 1984-1985, Donald from September 1984 to February 1985, and Frank from August 1984 to September 1986. None of the appellants had come into contact with either methylene chloride or other chemical solvents at any other work position. All, however, worked daily with methylene chloride while in appellee's employ. While so employed, William Ailiff suffered the usual symptoms of exposure to methylene chloride exposure: headaches, bloody nose, nausea, moodiness, shortness of breath, short term memory loss, irritability, and dizziness. Ailiff was diagnosed, after his departure from appellee, as having organic brain disease and toxic encepalopathy. He can no longer spell nor write and has given up driving because he cannot remember either where he is going or where he

has just been. Ailiff's disease is categorized as permanent and degenerating. Don Ailiff suffers from similar (though apparently less severe) symptoms, as did Frank. Appellee notes that all of the appellants quit the company because of alleged employer harassment. This is consonant with the feelings of irritability and moodiness caused by exposure to chemical.

The trial court, in sustaining appellee's motion for a directed verdict, applied the test set forth in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100. This test states:

"* * * [I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty and not just a high risk; and (3) that the employer, under such circumstances, and with such knowledge did act to require the employee to continue to perform the dangerous tasks." *Id.* at the fifth paragraph of the syllabus.

The trial court, construing all evidence in favor of the appellants, found that branches one and three of the *Van Fossen, supra,* test were proved. However, the court found that there was no substantial evidence which indicated that the appellee knew, to a substantial certainty, that such injuries would occur.

Appellants now timely appeal the trial court's granting of appellee's motion for a directed verdict, and raise the following assignment of error:

"The trial court erred to the prejudice of the plaintiffs-appellants in granting the defendant-appellee's motion for a directed verdict made at the close of plaintiffs-appellants' case."

Appellants' sole assignment of error contends that the trial court erred in finding that they could not prove their case as a matter of law. Ohio Civ. R. 50(A) (4) states:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the

motion and direct a verdict for the moving party as to that issue." Civ. R. 50(A)(4).

The question, therefore, is whether the trial court abused its discretion in granting appellee's motion.

A survey of intentional tort law cases in the wake of *Van Fossen, supra,* indicates that the particular burden established by the Ohio Supreme Court is sisyphean, requiring the adducement of evidence seldom, if ever, found in these cases.

Under the *Van Fossen* test, the employee has the burden of proof of demonstrating not only that a dangerous condition existed, but that the employer knew such conditions existed, *to substantial certainty,* and still continued to require his/her employees to interact with the dangerous condition. "Under this standard, an intentional tort occurs when '* * * the actor desires to cause the consequences of his act, or * * * he believes that the consequences are substantially certain to result from it.'" *Harasyn* v. *Normandy Metals, Inc.* (1990), 49 Ohio St. 3d 173, 175 quoting 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A.

The *Harasyn* court noted that the Restatement definition of an intentional tort, assimilated in *Van Fossen,* encompasses two different levels of intent.

"The first level, * * * 'direct intent,' is where the actor does something which brings about the exact result desired. In the second [inferred intent], the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result.

"It appears that most employer intentional torts * * * fall into the latter category."

Consequently, although the employee is not required to adduce evidence indicating that the employer directly intended that the employee be injured, the employee does have, in demonstrating inferred intent, the "burden of proof of proving by a preponderance of the evidence that the employer had 'actual knowledge of the exact dangers which ultimately caused' injury." *Sanek* v. *Duracote Corp.* (1989), 43 Ohio St. 3d 169, 172, quoting *Van Fossen, supra,* at 112.

"'As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure, or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.* * *'" *Sanek, supra,* at 171, quoting *Van Fossen,* at paragraph six of the syllabus.

The Ohio Supreme Court noted, in *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St 3d 135, that the standard for demonstrating an intentional tort by an employer "emerges not so much from the words used to formulate the test as it dies from the decisions rendered in response fact situations." *Kunkler, supra,* at 139, quoted in *Sanek, supra,* at 172. It is therefore instructive to compare the facts of the *Sanek* case with the case *sub judice* in order to ascertain how the standard emerges from specific fact patterns.

In *Sanek,* the plaintiff-employee was employed as a fabricator for the defendant-corporation. One of the plaintiff's tasks was to premix plastisol, which would later be applied to laminated fabrics or paper. On the day of the accident, plaintiff noticed that the industrial mixer he was using making a 'clapping noise'. Rather than shut the power off to the machine, plaintiff endeavored to correct the problem by grabbing the rotating shaft of the mixer Plaintiff's glove caught on the shaft, causing the amputation of his lower right arm.

Plaintiff's suit, in *Sanek,* was predicated on the failure of the defendant to install a safety guard on the rotating mixer, which would have prevented the injury. The court, however, noted that no guard was commercially available for use on the mixer utilized by the defendant. Moreover, the court found that, although OSHA regulations required such a guard, the defendant had never been cited by OSHA for noncompliance with the regulations, despite a number of inspections. The court further observed that no one had ever been injured, at defendant's plant, by a rotating mixer before. In conclusion, the *Sanek* court, echoing *Van Fossen,* stated:

"* * * [t]here are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness * * *. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort'* * *." *Sanek,* at 172-3, quoting *Van Fossen,* at 117.

A comparison between *Sanek* and the case *sub judice* reveals a number of crucial distinctions which are important in preparing a correct response to the specific *patterns. In Sanek* defendant's employees were issued the correct

gloves by the company. Further, no one employed by defendant ever instructed, or even suggested, that plaintiff reach into the mixer to correct the mechanical difficulty. The plaintiff performed this repair act of his own volition (even though he has seen other employees fix the machine the same way). No other accidents had occurred at defendant's plant of this type and defendant had never been cited by OSHA for failing to have a guard on the mixer. Defendant ultimately had to invent the part itself).

In comparison with *Sanek*, the facts of the case *sub judice* are far more indicative of the existence of an intentional tort. Appellee's unlike those in *Sanek*, were not given the correct safety equipment. Instead of neoprene gloves, they were issued white cotton gloves, which absorbed the methylene chloride, or cracked rubber gloves which afforded no protection. Employees testified that no goggles were available and that the only respirators available were either cotton surgical masks or carbon filter respirators, rather than the self contained breathing apparatus necessary to avoid breathing in methylene chloride fumes. Moreover, the plaintiff, in *Sanek*, attempted to fix the machine on his own, as opposed to being ordered to do so by a supervisor. In this case, appellee's supervisors instructed their employees to use methylene chloride to clean the equipment and themselves and required them to work with the solvent on a daily basis.

The question remains, however, did appellee know, to a substantial certainty, that exposure to methylene chloride would cause deleterious effects to its employees. Although the existence of the MSDS sheets is not determinative, in and of itself, of knowledge by the employer of the substantially certain nature of the injury, these sheets, along with scientific literature read by Balogh and Busler, clearly gave the company warnings as to possible effects which might result from the use of methylene chloride. Although this court agrees with appellee that these reports only state speculatively that harm "may" occur, this speculation appears to be (when interpreting all evidence in favor of the appellants) corroborated by the rash of ailments suffered by employees, all of which came to the attention of either of Jim Balogh, his wife (and personnel manager) Carol Busler, or the many company foremen.

Moreover, appellee's knowledge of the dangers of methylene chloride was not restricted solely to information on the MSDS sheets. Busler had worked with the solvent since the 1950s and was well aware of its potentially toxic effects, and Balogh testified that he had read extensively about methylene chloride in scientific journals since the 1970s. Examination of Balogh's testimony reveals that he knew, that to keep the plant safe, he needed to keep the solvent covered, so that the methylene chloride did not evaporate; he knew that the plant needed proper ventilation; that the employees needed proper gloves and should not have direct skin contact with the chemical; and he "certainly knew" that he did not want his employees washing their hands with the chemical. Finally, Balogh knew that, under certain conditions, prolonged exposure to methylene chloride was dangerous.

In comparing *Sanek* and this case, one further factor should be noted. In *Sanek*, OSHA inspectors did not cite the company for noncompliance with its regulations, despite not having a guard on the mixer. In the case *sub judice*, insurance and safety inspectors had no opportunity to inspect the use of the chemicals, as testimony indicates that they were cleaned and removed from the factory prior to any inspection by insurance or health officials, leading one to believe that the appellee wished to conceal the use of the chemical from any inspectors.

Consequently, while there is no evidence that appellee directly intended to poison its employees, the company, given its access to considerable literature about the dangers of methylene chloride, the rash of workplace injuries and illness which could be attributed to the solvent, and the apparent shielding of the use of the chemicals, can, under the *Harasyn* test, be found to have inferred intent to bring about the injuries to its employees. There was significant evidence in the trial record to show that appellee knew that these injuries were substantially certain to result from the procedures inherent in the plant, and still continued to utilize these methods. Ohio law will treat the company as if it had, in fact, desired the result. *Sanek*, at 171.

Examining the record in a manner most favorable to the appellants, one sees that appellee was confronted with a large series of work related conditions which matched exactly the symptomatology warned of by the MSDS sheets. Rather than ceasing the use of methylene chloride, at a time when work related ailments corroborated the safety warnings on the sheets, the company continued to use the solvent, in open containers where the chemicals evaporated;

502

as a medium for hand washing; and without the proper safety equipment. This continued use of the solvent, when work related ailments corroborated safety warning, and where the workers inquired about the chemicals' safety and where either misled or ignored, demonstrates volition beyond even recklessness, and appears to demonstrate knowledge, to a substantial certainty that the injury would occur.

This court therefore feels, reading the record most strongly in favor of the appellants, that the appellants carried the burden of proof in a manner sufficient to overcome the appellee's motion for a directed verdict.

Appellants' assignment is with merit.

Consequently, for the reasons set forth in this opinion, the judgment of the trial court is reversed and this case shall be remanded for a new trial, consisted with the dictates of this opinion.

*Judgment reversed and cause remanded.*

CHRISTLEY, P.J., and QUILLIN, J., sitting by assignment, concur.