RENWAND, Appellant,

v.

BRUSH WELLMAN, INC., Appellee.

[Cite as *Renwand v. Brush Wellman, Inc.*, 149 Ohio App.3d 692, 2002-Ohio-5849.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 80843.

Decided Oct. 24, 2002.

Waite, Schneider, Bayless & Chesley, Louise M. Roselle, Stanley M. Chesley, and Paul M. DeMarco; George Gerken, for appellant.

Jones, Day, Reavis & Pogue, Jeffery D. Ubersax, Mark J. Andreini and Robert S. Faxon, for appellee.

ANN DYKE, Judge.

{¶ 1}  Plaintiff-appellant Gary P. Renwand Jr. ("Renwand") appeals from the judgment of the trial court that granted summary judgment in favor of defen-

dant-appellee Brush Wellman, Inc. ("Brush Wellman"). For the reasons set forth below, we affirm the judgment of the trial court.

{¶ 2} Renwand filed a complaint against Brush Wellman on November 24, 1999, alleging that he contracted chronic beryllium disease ("CBD"), a workplace disease caused by exposure to beryllium,[1] as a result of an intentional tort of Brush Wellman and further alleging negligent infliction of emotional distress.

{¶ 3} Renwand began working at the Elmore Plant of Brush Wellman in 1978. Over the course of his employment, he worked in several areas of the plant. Initially, Renwand was a grinder in the ceramics department, then a machinist in the central machining area, and later in the machine shop. He worked briefly as an extrusion press operator and then as a janitor, and then returned to being a machinist. After being diagnosed with CBD on October 19, 1999, Renwand left the Elmore Plant shortly thereafter.

{¶ 4} Brush Wellman recognized that concentrations of airborne beryllium could not be detected by the human senses. Brush Wellman therefore frequently conducted air sampling surveys in all control areas and thereafter published the results for employees. The results of these air samples varied, and while Brush Wellman did not far exceed it, it is undisputed that Brush Wellman did not consistently achieve the OSHA-recommended level of 2 micrograms per cubic meters of air.[2]

{¶ 5} The United States Occupational Safety and Health Administration ("OSHA") has adopted a recommended occupational exposure limit of two micrograms per cubic meters of air, calculated as an eight-hour time-weighted average using air sample data collected over a three-month period. Additionally, OSHA provides a not-to-be-exceeded ceiling limit of 5 micrograms per cubic meters of air, with the exception that no peak exposure should exceed 25 for a period of more than 30 minutes.

{¶ 6} Brush Wellman undertook an epidemiological study to determine the incidence of CBD at the Elmore plant. In 1995, the results were released and shared with employees. The study found that the incidence rate of CBD in the workforce was 4 percent, with an 8 percent rate of CBD incidence with the ceramics plant. It is generally known that the incidence of CBD among people exposed to beryllium levels over 2 micrograms is between 2 and 4 percent.

---

1. Chronic beryllium disease is a potential hazard of processing beryllium. CBD results from an allergy-like lung response to inhaling airborne beryllium particles.

2. There is evidence that on different occasions, the air counts at the Brush Wellman plant exceeded the OSHA standard for a few hours due to beryllium spills in the plant. The evidence indicated that Brush Wellman was diligent in cleaning up the spills and ensuring that employees were subjected to minimal exposure of beryllium.

{¶ 7} In his complaint, Renwand asserted that Brush Wellman deliberately and intentionally exposed him to unreasonably and abnormally hazardous working conditions, knowing that injury and disease would occur.

{¶ 8} Brush Wellman moved for summary judgment, which the trial court granted. In its journal entry, the trial court noted that "the evidence does not reflect, upon the part of the defendant, the conscious indifference to employee safety contemplated by the intentional tort cases, and there existed but a statistical likelihood that 2–4% of work force might become ill, not a substantial certainty that Mr. Renwand would be harmed * * *."

{¶ 9} It is from this ruling that Renwand now appeals, asserting one assignment of error for our review.

{¶ 10} "The trial court erred in granting summary judgment to defendant on plaintiff's exposure-based intentional tort claim, under *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 118 [1108]."

{¶ 11} In his sole assignment of error, the appellant contends that there exists a genuine issue of material fact as to whether Brush Wellman intended to cause harm to Renwand. Specifically, Renwand argues that he proved that Brush Wellman knew with substantial certainty that harm would result from exposure to beryllium. We disagree.

{¶ 12} With regard to procedure, we note that this court reviews the lower court's grant of summary judgment de novo in accordance with the standards set forth in Civ.R. 56(C). *N. Coast Cable L.P. v. Hanneman* (1994), 98 Ohio App.3d 434, 440, 648 N.E.2d 875. In order for summary judgment to be properly rendered, it must be determined that:

{¶ 13} "(1) [N]o genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from such evidence that reasonable minds can come to but one conclusion and, viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. See, also, *State ex rel. Zimmerman v. Tompkins* (1996), 75 Ohio St.3d 447, 448, 663 N.E.2d 639. The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201. When faced with a proper motion, a party opposing summary judgment must come forward with sufficient evidence on issues on which he will bear the burden of proof at trial. *Felker v. Schwenke* (1998), 129 Ohio App.3d 427, 430, 717 N.E.2d 1165. Thus, where the nonmoving

party would have the burden of proving a number of elements in order to prevail at trial, the moving party in the summary judgment motion may point to evidence that the nonmoving party cannot possibly prevail on an essential element of the claim. See, e.g., *Stivison v. Goodyear Tire & Rubber Co.* (1997), 80 Ohio St.3d 498, 499, 687 N.E.2d 458. If the moving party meets this burden of proof, the burden then shifts to the nonmoving party to show that there is a genuine issue of material fact as to that element. *Celotex*, supra. Specifically, in an action by an employee against his employer alleging an intentional tort, upon motion for summary judgment by the defendant employer, the plaintiff employee must set forth specific facts which demonstrate the existence of a genuine issue of whether the employer committed an intentional tort against his employee. *State ex rel. Zimmerman v. Tompkins*, supra, at 449, 663 N.E.2d 639. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489.

■ {¶ 14} With regard to the appellant's substantive claim, we note that, generally, an employee's only recourse in Ohio for compensation for job-related injuries is through the workers' compensation system. However, an employee is not precluded from enforcing his common-law rights against his employer for an intentional tort. *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572.

{¶ 15} The Supreme Court has stated with regard to intentional tort claims against an employer: "[I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated:

{¶ 16} "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)" *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108.

■ {¶ 17} The determinative issue in an employer intentional tort case is whether the employer intended to cause injury to its employee. Intent may be established by demonstrating that the employer actually intended the harm or that the employer knew that the harm was substantially certain to occur. Id. In comparing negligence, recklessness and, intent, the Supreme Court stated in paragraph two of the syllabus in *Fyffe*:

{¶ 18} "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desire to produce the result. *However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent.* (*Van Fossen v. Babcock Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph six of the syllabus, modified as set forth above and explained.)" (Emphasis added.)

{¶ 19} In seeking to define intentional tort, the *Van Fossen* court noted that not all such obvious risks incident to dangerous employment situations will rise to the level of the intentional tort standard:

{¶ 20} "[I]n determining the level of 'risk exposure that will satisfy the "intentional wrong" exception * * * [c]ourts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitled the employee to recover only under the Compensation Act?'"

{¶ 21} In determining whether an employer's conduct is sufficiently egregious as to constitute an intentional tort, courts must not construe "intentional tort" too broadly. *Goodin v. Columbia Gas of Ohio* (2000), 141 Ohio App.3d 207, 750 N.E.2d 1122. As the Supreme Court noted in *Van Fossen*:

{¶ 22} " '[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the [Workers' Compensation] Act is not circumvented *simply because a known risk later blossoms into reality.*'" (Emphasis added.)

{¶ 23} As several courts have noted, establishing that the employers' conduct was more than negligence or recklessness "is a difficult standard to meet." *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 246, 659 N.E.2d 317. "The test makes it abundantly clear that the analysis of 'intent' rests upon the employer's actual knowledge of, and its response to, the dangerous situation which resulted in the plaintiff/employee's injury." *Youngbird v. Whirlpool Corp.* (1994), 99 Ohio App.3d 740, 651 N.E.2d 1314.

{¶ 24} In this case, we conclude that the CBD which Renwand contracted is, unfortunately, "a fact of life of industrial employment" and a "known risk [which] later blossom[ed] into reality" as contemplated by *Van Fossen*. The evidence in this case is undisputed with regard to Brush Wellman's knowledge and appreciation of the risk that overexposure to beryllium causes CBD. However, our inquiry does not end at whether Brush Wellman knew of the dangers associated with exposure to beryllium at levels higher than 2 micrograms per cubic meters of air. Rather, we must look to see if, despite this knowledge, Brush Wellman was substantially certain that a portion of its employees would contract CBD and despite this risk, required its employees to continue to work in such dangerous conditions. That is, we should look to see if Brush Wellman failed to adequately protect employees from the inherent dangers of beryllium exposure, whether Brush Wellman evinced disregard for safety of its employees, and whether Brush Wellman failed even to attempt to achieve recommended safety levels as set forth by the United States Occupational Safety and Health Administration. In response to this inquiry, we note that the record is replete with evidence that Brush did not fail in this regard.

{¶ 25} Brush Wellman had a health and safety department. Renwand testified that it was his understanding that the purpose of this department was to monitor potential beryllium hazards, inform the employees of how to use the safety equipment, and prevent exposure to beryllium. As a part of the hiring process, Brush Wellman distributed to potential employees an orientation and safety training manual, which included warnings about the hazards of working with and around beryllium. The manual contained information about CBD and Brush Wellman's methods of minimizing employees' exposure to beryllium. Specifically, the manual outlined procedures for employees to follow to minimize the effects of beryllium exposure and other information about ventilation systems, standard operating procedures, and respirators. Further, new employees receive a health and safety orientation, which included specific information about beryllium exposure and the hazards associated with exposure to it. At that time, employees were encouraged to ask questions and were also given personal safety instructions from an industrial hygienist from the environmental health and safety department at Brush Wellman. Renwand testified that at the time he started working at Brush Wellman, he was aware that results of air samples taken by the health and safety department were posted on bulletin boards for the employees to read.

{¶ 26} Brush Wellman conducted monthly safety meetings, some of which addressed safety regarding beryllium. Brush Wellman continually updated its employees as they learned new information about beryllium and CBD. After a study was conducted in 1993 and completed in 1995, Brush Wellman announced

the findings to their employees via a "Statement of Current Knowledge." In that statement, Brush Wellman updated the employees on beryllium, CBD, the incidence of CBD at Brush Wellman, and current safe work practices. Thereafter, Brush Wellman held annual meetings to discuss and announce rates of CBD occurrence within the plant. Also, in 1989 Brush Wellman also distributed to its employees a video entitled "Working Safely with Beryllium."

{¶ 27} Brush Wellman regularly conducted tests of the air in the plant to determine airborne beryllium counts. The results from these tests were made available to all employees via bulletin boards. Brush Wellman employees were also aware that they could request results from air samples at any given time. These air samples were taken by the company to monitor beryllium levels and to identify areas where corrective measures were necessary.

{¶ 28} Further, Brush Wellman instituted a program it calls "ALARA" (As Low As Reasonably Achievable), which is a continual effort to reduce beryllium levels to the lowest practical level.

{¶ 29} The record demonstrates that Brush Wellman encouraged its employees to practice safety in the workplace. There is evidence that demonstrates that Brush Wellman made significant changes regarding beryllium health and safety in the mid to late 1990s as they learned more about CBD. For instance, after finding that certain work areas contained higher counts of airborne beryllium, Brush Wellman installed ventilation equipment and hoods to capture airborne beryllium particles in an attempt to thwart any spread to employees. Similarly, while Brush Wellman had always made respirator masks available to employees, they made it mandatory for certain workers to wear respirators in areas where they had learned that airborne beryllium was particularly higher than in other areas. In fact, Renwand testified that he was required to wear a respirator full-time in his position in the machine shop.

{¶ 30} Renwand testified that he was told to clean up any dust accumulations immediately with a vacuum or wet cleaning equipment in order to keep airborne dust to a minimum. He was instructed to follow Brush Wellman's procedure for keeping street clothes and work clothes separate. In fact, Brush Wellman had a separate room for employees to remove their soiled work clothes, shower, and change into their street clothes so as to minimize any continued exposure to beryllium. Brush Wellman handled and washed the soiled clothes for its employees in a contained wash room.

{¶ 31} Renwand testified that Brush Wellman repeatedly gave him pulmonary-function tests while he was in the ceramics division to determine whether he was sensitive to beryllium. Further, Renwand testified that Brush Wellman instituted a blood-testing program for its employees in 1993 and again in 1999 to determine if employees had developed CBD.

{¶ 32} The aforementioned facts indicate that Brush Wellman set forth sufficient evidence in support of its motion for summary judgment on the intentional tort issue. There was ample evidence to support the trial court's determination that Brush Wellman was not "substantially certain" that its employees would contract CBD from working at the plant. In fact, the evidence indicated that Brush Wellman instituted safety precautions with regard to procedures and employee awareness to ensure that employees would not contract CBD. The evidence presented showed that Brush Wellman did not disregard the safety of any of its employees and worked diligently to protect its employees from CBD. Acknowledging this, we cannot say that Brush Wellman knew that it was substantially certain that its employees would develop CBD.

{¶ 33} The appellant relies on the Eleventh District case of *Ailiff v. Mar–Bal, Inc.* (1990), 62 Ohio App.3d 232, 575 N.E.2d 228, for support of its contention that because an employer knows of a potential danger of a chemical, this knowledge equates to a "substantial certainty" that the danger will occur. However, Renwand's reliance is misplaced. The syllabus in *Ailiff* states:

{¶ 34} "In an action against his employer for an alleged intentional tort, an employee sustains his burden of proving the employer's 'substantial certainty' that harm will occur, sufficient to withstand the employer's motion for a directed verdict, where the employee adduces evidence that the employer instructed its employees repeatedly to use a toxic chemical in an unsafe manner, without adequate protection, that the employer's agents had either personally witnessed the toxic effects of this chemical or had read literature describing such effects, that the employer's agents were aware of the recommended safety precautions, but took no steps to implement them, and that the symptoms manifested by the employees and reported to the employer were consistent with those described in the literature." The *Ailiff* court acknowledged the importance of the employer's response to knowledge and appreciation of a risk to its employees. As was the case here, Brush Wellman responded with diligence to ensure its employees were exposed minimally to beryllium, thus reducing any risk that they might contract CBD.

{¶ 35} We find that the trial court did not err in granting summary judgment to Brush Wellman.

Judgment affirmed.

TIMOTHY E. MCMONAGLE, A.J., and FRANK D. CELEBREZZE, JR., J., concur.