OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Plaintiffs-Appellants, Richard and Geraldine Crnarich, appeal the judgment of the Mahoning County Court of Common Pleas which granted summary judgment to Defendant-Appellee, United Foundries, Inc. ("UF"). The issue we must resolve is whether the trial court properly concluded that, when looking at the facts in the light most favorable to the Crnariches, no reasonable fact-finder could have found that UF committed an intentional tort against Richard.
 {¶ 2} In order for an employee to recover from an employer for an intentional tort, the employee must prove, among other things, that the employer knew with substantial certainty that an injury would occur if the employee was exposed to a dangerous condition or process. The facts in this case support a conclusion that UF recklessly disregarded the danger. But recklessness is less than substantial certainty. We conclude no reasonable fact-finder could find that the Crnariches proved this element of their claim. Thus, the trial court's judgment is affirmed.
 Facts {¶ 3} UF is a company which owns a foundry in Youngstown, Ohio. Many of the employees at that company, including plant management, had been working for UF or the companies which previously owned the plant for a long period of time. UF was in the business of making large metal objects. In order to do this, it had to melt the metal, pour that metal into molds, and let that metal cool in pouring pits. After the metal cooled, the molds were taken off in an area near the pits known as the shakeout floor.
 {¶ 4} There were three basic types of molds which were used at UF. The first type, sand molds, had been used at UF for years. These molds, or copes, had to be made from scratch each time one was needed. Molders were required to wash these molds with a water-based solution by taking a horsetail swab and coating the inside of the cope with the wash. These copes would then be placed in an oven to dry out, which could take days. The purpose of the wash was to keep the molten metal from interacting with the mold.
 {¶ 5} The second type of mold were air-set molds, which were also made of sand. But the sand in this type of mold contained an epoxy which made the sand self-adhesive, negating the need to bake the mold before use. Using a water-based wash on these molds would be counter-productive, so the company used an alcohol-based solution. At the time of the accident, the type of solution UF used was named Velvalite. Employees followed a similar procedure when washing these types of sand copes. But after the employees were done swabbing the inside of these copes, they would "light off" the cope by throwing a match or burning paper inside the cope. This would cause the Velvalite to burn in a manner similar to a sterno. The employees then repeated the procedure. After the second burn off, the cope could be used. Like sand copes, these copes could only be used once and had been in use for years at UF.
 {¶ 6} The third type of mold was known as a castable cope. This was a ceramic or concrete mold which could be used repeatedly. UF first purchased this type of cope in late 1998 or early 1999. This type of cope was washed and burned with the Velvalite prior to use in the same manner as the air-set molds.
 {¶ 7} Velvalite was used in a variety of ways in the foundry. For instance, it was used to wash extensions, another piece of equipment used in the plant, and was used in other departments, such as the Kool Flo department. It was transported around the plant in open, plastic buckets. Management and employees knew Velvalite was flammable and had seen the buckets light and melt for unexplained reasons on a couple of occassions. In addition, swabs had caught fire for unexplained reasons. But no one had been injured by these fires since the fire was a small, slow burning fire. The company provided flame-retardant clothing to its employees, but did not require that molders use that equipment when washing the copes.
 {¶ 8} The sand molds and air-set molds were washed in an area near where those molds were made at the north end of the plant. When UF started using castable copes, it did not have them washed in the same place. Instead, it had them washed in a place known as the cooling floor. This area was on the south end of the plant, a distance away from the shakeout floor where the product was taken out of the copes. In addition, it was near a furnace which occasionally sent out sparks. Because of the danger of having the castable copes washed near the furnace and the convenience of having the copes near the shakeout floor, UF had the area where the castable copes were washed moved to the shakeout floor sometime near the beginning of June 1999.
 {¶ 9} Richard began working for UF in August 1988 and soon thereafter joined the molding department. In the department he was a set-up molder. This meant he was primarily responsible for washing out the copes and, after UF started using castable copes, he was the employee who washed those copes the vast majority of the time. He was trained to wash out all kinds of copes by his superiors. His immediate supervisor instructed him on how to wash out the castable copes. In 1999, Richard was laid off and when he returned at the beginning of June the castable cope washing area had been moved to the shakeout floor.
 {¶ 10} One day in June 1999, Richard was told he had to wash out a castable cope. The cope he had to wash was almost six feet high, so he placed a ladder against it. He also attached an extension to his swab so he could reach the bottom of the cope. At the time, he was wearing flame-retardant pants, but was not wearing a flame-retardant jacket, gloves, or a face shield. After he climbed the ladder, Richard placed the bucket of Velvalite on top of the cope to decrease the risk of spillage. While he was washing the inside, the cope somehow caught fire. The explosion knocked Richard backward and he knocked the bucket off the cope as he was falling down. The bucket of Velvalite caught fire and spilled on him. As a result, Richard suffered serious injuries and was permanently disabled.
 {¶ 11} The Crnariches filed a complaint against UF which alleged UF committed an employer intentional tort against Richard. Subsequently, UF filed a motion for summary judgment, arguing the Crnariches could not prove the elements of an employer intentional tort. The Crnariches responded by arguing there was a genuine issue of material fact on each of the three elements of an employer intentional tort. The Crnariches attached two expert opinions to their memorandum. Those experts opined that UF had violated several state and federal regulations regarding the use and handling of flammable substances such as Velvalite. In addition, the experts concluded UF failed to follow the recommendations on the Material Safety Data Sheet supplied by the manufacturer regarding the use and handling of Velvalite. The trial court granted UF's motion for summary judgment. It is from this judgment that the Crnariches timely appeal.
 Employer Intentional Tort {¶ 12} On appeal, the Crnariches assert two assignments of error. Those assignments of error deal with the same issues of law and fact. Accordingly, we will address them together. Those assignments of error assert as follows:
 {¶ 13} "The trial court erred in granting Defendant, United Foundries' motion for summary judgment, because the evidence in the court record establishes a genuine issue of material fact as to each element of Plaintiff's employer intentional tort claim."
 {¶ 14} "The trial court erred in granting Defendant United Foundries' motion for summary judgment, where the court record contains uncontradicted expert affidavits supporting Plaintiff's claim as to the first two elements of an employer intentional tort claim as defined inFyffe v. Genos, Inc. (1991) 59 Ohio St.3d 115, 570 N.E.2d 1108."
 {¶ 15} The Crnariches argue that the trial court improperly granted summary judgment on their intentional tort claim to UF. When reviewing a trial court's decision to grant summary judgment, an appellate court applies the same standard used by the trial court and, therefore, engages in a de novo review. Parenti v. Goodyear Tire Rubber Co. (1990), 66 Ohio App.3d 826, 829. Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the non-movant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. Doe v.Shaffer (2000), 90 Ohio St.3d 388, 390. A fact is material when it affects the outcome of the suit under the applicable substantive law.Russell v. Interim Personnel, Inc. (1999), 135 Ohio App.3d 301, 304.
 {¶ 16} When moving for summary judgment, a party must produce some facts that suggest that a reasonable fact-finder could rule in his favor. Brewer v. Cleveland Bd. of Edn. (1997), 122 Ohio App.3d 378, 386. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt
(1996), 75 Ohio St.3d 280, 296. The nonmoving party has the reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. Id. at 293. "In order to overcome an employer-defendant's motion for summary judgment on an intentional tort claim, the plaintiff must set forth specific facts showing there is a genuine issue as to whether the employer committed an intentional tort." Burgos v. Areway,Inc. (1996), 114 Ohio App.3d 380, 383.
 {¶ 17} The Crnariches allege that UF committed an intentional tort against Richard. In order to recover against an employer for an intentional tort, an employee must prove the three part test the Ohio Supreme Court articulated in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115.
 {¶ 18} "[I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus.
 {¶ 19} The primary concern in any case where an employee is claiming his employer committed an intentional tort against him is whether the employer, "through its policies and conditions of employment, placed [the employee] in a position where he was subjected to a `dangerous process, procedure, instrumentality or condition' and harm was substantially certain to follow." Gibson v. Drainage Products, Inc.,95 Ohio St.3d 171, 2002-Ohio-2008, ¶ 27.
 {¶ 20} Although we could apply each of the three parts of theFyffe test to the facts in this case, "if the injured employee fails to present sufficient evidence to support any one of the three requirements, summary judgment in favor of the employer is appropriate." Hunter v.Interpak, Inc., 11th Dist. No. 2001-L-198, 2002-Ohio-7149, ¶ 14. Because we conclude the Crnariches have failed to demonstrate that a reasonable factfinder could find they have proven the second prong of theFyffe test, we will address that prong first
 {¶ 21} The second prong of the Fyffe test requires that the plaintiff demonstrate that the employer was substantially certain that an employee would be injured if exposed to the dangerous condition. As other courts have stated, "[t]his is a difficult standard to meet." McGee v.Goodyear Atomic Corp. (1995), 103 Ohio App.3d 236, 246; Hunter at ¶ 19. As Fyffe stated at paragraph two of its syllabus, the employer's conduct must be more than negligent or reckless.
 {¶ 22} "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id.
 {¶ 23} Under the Fyffe test, if a dangerous condition is substantially certain to injure an employee, intent is inferred. Goodinv. Columbia Gas of Ohio, Inc. (2000), 141 Ohio App.3d 207, 218, citingHarasyn v. Normandy Metals, Inc. (1990), 49 Ohio St.3d 175. "Thus, the employee need not illustrate that the employer subjectively intended to `accomplish the consequences.'" Id. "What constitutes a `substantially certain' result will vary from case to case based on the facts involved."Richie v. Rogers Cartage Co. (1993), 89 Ohio App.3d 638, 644. "An expert report stating that the accident was substantially certain to occur may not be sufficient to prevent summary judgment in favor of the employer on the employee's intentional tort claim." Burgos v. Areway, Inc. (1996),114 Ohio App.3d 380, 384.
 {¶ 24} In support of their contention that UF knew injury was a substantial certainty, the Crnariches point to management's knowledge of the properties of Velvalite, its constructive knowledge that it was using the wrong type of container to handle Velvalite, and their experts' conclusions that an injury was substantially certain to occur. In contrast, UF argues it could not be substantially certain that injury would occur since there were no prior injuries or accidents and no one knows the cause of Richard's accident. It argues that the evidence the Crnariches point to demonstrate "at most" that it was possible that a fire might start.
 {¶ 25} The Tenth District was faced with a somewhat similar situation in Foust v. Magnum Restaurants, Inc. (1994), 97 Ohio App.3d 451,455. In Foust, the plaintiff worked for a restaurant and as part of his employment was required to remove hot grease from a deep fat fryer for disposal. The plaintiff was carrying a five-gallon metal bucket without a lid which was filled with hot grease. The grease splashed onto the plaintiff's face, causing him to drop the bucket on the floor. He then slipped and fell into the hot grease and was injured. The plaintiff filed suit against his employer, alleging his employer had committed an intentional tort against him. The employer filed a motion for summary judgment, which the trial court granted.
 {¶ 26} The appellate court concluded the trial court correctly determined the plaintiff failed to provide sufficient evidence on the second prong of the Fyffe test. The court noted the procedure had been performed thousands of times without a prior accident and that the plaintiff had performed the task over a hundred times without incident. It further noted that safety equipment was provided by the employer and available at all times and that the plaintiff acknowledged that he chose not to wear that equipment. The court found that when it construed the evidence in the light most favorable to the plaintiff, that there was a lack of enforcement of use of the safety equipment. But the court found that these facts fell short of demonstrating the employer knew with substantial certainty that an injury would result.
 {¶ 27} Although the facts in this case are different than those inFoust, there are certain similarities. For instance, in both cases there is a lack of a prior accident. As Foust and many other Ohio cases have stated, evidence of prior accidents involving the procedure at issue is one factor to be considered under the second prong of Fyffe. Van Fossen
at 118; Taulbee v. Adience (1997), 120 Ohio App.3d 11, 20. In addition, a history of "near misses" may demonstrate that the employer is aware that the dangerous condition could result in serious injury. Moebius at ¶ 39.
 {¶ 28} "Where there is a one-time occurrence, or when the same event happens twice, the likelihood of the event becomes more palpable. If the event occurs, exactly as before, a third time, the result of the fourth occurrence can be reasonably anticipated. If it happens a fourth time, it approaches substantial certainty, and few would expect an outcome other than that which had just previously occurred." Blanton v.Pine Creek Farms (1995), 100 Ohio App.3d 677, 684. But as courts have stated:
 {¶ 29} "Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of Fyffe." Cook at 429-430.
 {¶ 30} Thus, while the absence of prior accidents, standing alone, may not be conclusive, it strongly suggests that injury from the procedure was not substantially certain to result from the manner in which the job was performed. Taulbee at 20; Foust at 455.
 {¶ 31} These cases demonstrate that the probative value of prior accidents or the lack thereof is based on the similarity of the procedures used at the time of the accident to the procedure used at the time of the accident. The Crnariches argue UF was employing a new procedure for washing out the castable copes which cannot be compared to how UF used Velvalite previously. But there are similarities between the procedure used to wash the castable copes in the shakeout area and the procedures used to wash those copes and the air-set molds in other areas of the building. As Richard testified, from his point of view the procedure was unchanged. For example, the employees had always placed the Velvalite in open, plastic buckets and he had always swabbed the inside of the copes with the same type of horsehair brush. Furthermore, the employees and management at UF were familiar with Velvalite as they had been using it for years for various purposes without incident.
 {¶ 32} Given the fact that UF moved the washing area for the castable copes soon before the accident, UF's argument regarding the lack of a prior incident is less persuasive than the same argument was inFoust. Furthermore, we cannot compare the respective dangers at the two areas. Thus, we must presume the facts in the light most favorable to the Crnariches and must assume that some of the dangers the experts refer to were unique to the shakeout area. But the fact remains that Schraider testified there were dangers present at the old washing location. He specifically worried about sparks from a furnace accidentally lighting the Velvalite. Thus, the lack of a prior accident with Velvalite is still a factor we must consider when determining whether UF knew with substantial certainty that an injury would result.
 {¶ 33} After reviewing the facts in their entirety, we conclude no reasonable factfinder could find that UF knew with substantial certainty that an injury would result when the castable copes were washed in the shakeout area. Although the company had not been washing castable copes for very long, eight months at most, it had a long history of using Velvalite for other purposes around the plant, such as washing air-set molds and extensions. Schraider had ordered the castable copes be washed on blocks at the old area and no one saw a problem with that. Schraider and Russell moved the castable cope washing area to the shakeout area in part because they thought that place would be safer as it was further away from the furnace which put off flying sparks.
 {¶ 34} Of course, UF knew that the horsehair swabs and the buckets of Velvalite had caught on fire for unexplained reasons. But no one was hurt in any of those incidents. UF's experience with Velvalite gave its management the impression that an accident would not occur. Clearly, that impression was wrong and UF's ignorance of the dangers could easily be characterized as negligent or reckless. But its actions fall short of the higher standard of knowledge with substantial certainty that Richard would sustain injury under these circumstances. Fundamentally, a reasonable fact-finder could find UF knew of the risk, but it does not appear one could find that it truly appreciated that risk. This is significant since mere knowledge and appreciation of a risk does not constitute intent. Fyffe at paragraph two of the syllabus. Thus, the Crnariches' argument that UF knew with substantial certainty that an employee would be injured by the dangerous condition is meritless.
 {¶ 35} Because the Crnariches have failed to demonstrate that, when looking at the facts in the light most favorable to them, that a reasonable fact-finder could conclude that UF knew with substantial certainty that an injury would occur, they have failed to meet the second prong of Fyffe. Thus, Appellants assignments of error are meritless.
 {¶ 36} According the judgment of the trial court granting summary judgment to UF is affirmed.
Judgment affirmed.
Waite, P.J., concurs.
Donofrio, J., dissents, see dissenting opinion