OPINION
{¶ 1} Plaintiffs-appellants, Royce Ford, Christine Ford, Jacob W. Eyerman, and Jonathan Ford (collectively "appellants"), appeal from the judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Complete General Construction Company ("CGC"), on appellants' claims for employer intentional tort and loss of consortium. For the following reasons, we affirm.
 {¶ 2} On September 20, 2002, Royce Ford ("Ford") was employed by CGC as a pipe layer. On that morning, Ford was part of a CGC crew laying sewer pipe on Martin Road in Columbus, Ohio, and was checking the grade in a pipe trench. Behind Ford, outside the trench, CGC employee Cecil Storts ("Storts") was operating a Komatsu Model 228 excavator (the "excavator"). Storts was preparing to dump gravel into the trench to stabilize recently laid pipe, using a bucket attached to the excavator with a Slide-Loc coupler (the "coupler") manufactured by JRB Company, Inc. ("JRB"). CGC leased both the excavator and the coupler from Columbus Equipment Company ("Columbus Equipment") on May 15, 2002. Ford suffered severe injuries when the bucket unexpectedly detached from the coupler, rolled, and pinned Ford from the chest up against the recently laid concrete pipe.
 {¶ 3} Appellants filed a complaint against CGC in the Franklin County Court of Common Pleas on January 15, 2003, alleging claims for employer intentional tort and loss of consortium. On October 1, 2003, appellants filed an amended complaint, adding negligence and product liability claims against Columbus Equipment. Columbus Equipment filed an answer to appellants' amended complaint on November 20, 2003, a third-party complaint for indemnification and/or contribution against JRB on May 7, 2004, and a cross-claim against CGC on May 27, 2005.
 {¶ 4} On July 29, 2005, CGC, Columbus Equipment, and JRB filed motions for summary judgment. On February 23, 2006, the trial court granted CGC's motion for summary judgment. Thereafter, on March 14, 2006, appellants dismissed their claims against Columbus Equipment with prejudice, pursuant to Civ. R. 41(A)(1)(b). On April 6, 2006, Columbus Equipment voluntarily dismissed its cross-claim against CGC and its third-party complaint against JRB without prejudice.
 {¶ 5} In accordance with its February 23, 2006 decision, the trial court entered final judgment in favor of CGC on April 19, 2006. Appellants filed a timely notice of appeal and present a single assignment of error for our consideration:
 The trial court erred in granting summary judgment to Appellee Complete General Construction Company ("Complete General") because genuine issues of material fact exist concerning whether Complete General knew that its dangerous process, procedure or instrumentality was substantially certain to injure Appellant Royce Ford ("Ford"). Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115.
The issue presented under appellants' assignment of error is whether the trial court erred in granting summary judgment in favor of CGC.
 {¶ 6} Appellate review of summary judgments is de novo. Koos v. Cent.Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588, citing Brown v.Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107; Brown at 711. We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it. Coventry Twp.v. Ecker (1995), 101 Ohio App.3d 38, 41-42.
 {¶ 7} Pursuant to Civ. R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party.Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66.
 {¶ 8} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996), 75 Ohio St.3d 280,292. Once the moving party meets its initial burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial. Id. at 293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359.
 {¶ 9} Bearing in mind these standards, we turn to appellants' claim for employer intentional tort. The Ohio Workers' Compensation Act generally provides participating employers immunity from claims seeking damages for death, injury or occupational disease of its employees.Vermett v. Fred Christen Sons Co. (2000), 138 Ohio App.3d 586,598-599, citing Section 35, Article II, Ohio Constitution. However, such immunity "does not apply when an employer intentional tort has occurred within the context of the employer/employee relationship." Id. at 599, citing Blankenship v. Cincinnati Milacron Chemicals (1982),69 Ohio St.2d 608, syllabus. When an employer moves for summary judgment on an employer intentional tort claim, the plaintiff-employee must set forth specific facts showing a genuine issue as to whether the employer committed an intentional tort against the employee. Van Fossen v.Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, at paragraph seven of the syllabus.
 {¶ 10} The Ohio Supreme Court of Ohio set forth the law applicable to employer intentional tort claims in paragraph one of the syllabus ofFyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115:
 * * * [I]n order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. * * *
In the second paragraph of the Fyffe syllabus, the court continued:
 To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent. * * *
(Emphasis added.) Because a plaintiff must satisfy all three prongs of the Fyffe test, failure of proof with respect to any one prong renders immaterial disputes of fact with respect to the other prongs. Keller v.Northwest Conduit Corp. (Sept. 26, 2000), Franklin App. No. 99AP-1403.
 {¶ 11} The Ohio Supreme Court has cautioned against construing the cause of action for employer intentional tort too broadly:
 * * * "[T]he dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the [Workers' Compensation] Act is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty.["] * * *
Van Fossen at 116, quoting Millison v. E.I. du Pont de Nemours Co. (1985), 101 N.J. 161, 178. Ohio courts have recognized that establishing that an employer's conduct was more than negligence or recklessness, and thus satisfies the requirement for an employer intentional tort, "`is a difficult standard to meet.'" Goodin v.Columbia Gas of Ohio, Inc. (2000), 141 Ohio App.3d 207, 220, quotingMcGee v. Goodyear Atomic Corp. (1995), 103 Ohio App.3d 236, 246.
 {¶ 12} CGC moved the trial court for summary judgment based on the first and second prongs of the Fyffe test. With respect to the first prong, the trial court agreed with CGC's assertion that the coupler did not constitute a dangerous instrumentality or condition. The trial court also concluded that evidence regarding Storts' procedure for attaching the bucket to the coupler and for testing the attachment was "insufficient to support the significantly higher threshold required to prove intentional tort." With respect to the second prong, the trial court stated: "Here, despite the voluminous record presented, the court is unable to find that CGC knew that Ford's injuries were substantially certain to occur using the equipment at issue and utilizing the policies in place." Having concluded that the evidence failed to establish a genuine issue of material fact as to either the first or second prongs of the Fyffe test, the trial court granted CGC's motion for summary judgment.
 {¶ 13} On appeal, appellants' contentions regarding a dangerous condition within CGC's business operation center on the absence of a supplemental safety lock on the coupler and on the procedures used to attach the bucket to the coupler and to test the attachment. When asked to identify the dangerous condition in CGC's business operation, appellants' expert, John Messineo, P.E., stated: "That was the lack of the supplemental safety lock on the coupler. It was also not performing the proper pressure test. That was also not performing the proper curl-uncurl of the bucket after performing the pressure test. So I could say the improper performance of the check was also a dangerous condition." (Messineo Depo. at 105.)
 {¶ 14} Whether or not the evidence demonstrates a genuine issue of material fact regarding CGC's knowledge of a dangerous process, procedure, instrumentality or condition within its business operation, we find no genuine issue of material fact regarding CGC's knowledge, or lack thereof, that harm to Ford was a substantial certainty. Because failure of proof with respect to any one prong of the Fyffe test warrants judgment in favor of the employer and renders immaterial disputes of fact with respect to the other Fyffe prongs, we turn to the second prong of the Fyffe test.
 {¶ 15} The second prong of the Fyffe test requires a plaintiff to establish knowledge by the employer that injury to the employee was substantially certain to occur as a result of a dangerous process, procedure, instrumentality or condition within the employer's business operation. The existence of the employer's knowledge may be inferred from the surrounding circumstances and the actor's conduct. Howard v.Columbus Prod. Co. (1992), 82 Ohio App.3d 129, 135. Something more than a dangerous condition is required to establish the existence of a genuine issue of material fact regarding whether an employer knew that injury to its employee was substantially certain to occur. Despas v.Cleveland Cement Co. (June 21, 2001), Franklin App. No. 00AP-964, citingKirk v. Colburn (Dec. 31, 1997), Williams App. No. WM-97-002.
 {¶ 16} A difficult issue in any employer intentional tort case is the degree of risk an employer may take before its conduct is legally considered an intentional act to injure. Buccione v. Cincinnati,Inc. (Dec. 13, 1991), Huron App. No. H-90-27. To satisfy the second prong of the Fyffe test, this court has stated:
 * * * [P]laintiff had to produce evidence that [the employer] knew of the substantial certainty of injury to plaintiff as a result of the dangerous condition. "[E]ven if an injury is foreseeable, and even if it is probable that the injury would occur if one were exposed to the danger enough times, `there is a difference between probability and substantial certainty.'" * * * "[T]he mere knowledge and appreciation of a risk — something short of substantial certainty-is not intent." * * * Unless the employer actually intends to produce the harmful result or knows that injury to its employee is certain or substantially certain to result from the dangerous instrumentality or condition, the employer cannot be held liable. * * * Accordingly, an intentional-tort action against an employer is not shown simply because a known risk later blossoms into reality. * * * Rather, "the level of risk-exposure [must be] so egregious as to constitute an intentional wrong." * * *
Berge v. Columbus Community Cable Access (1999), 136 Ohio App.3d 281,308-309. We have also explained the second prong of the Fyffe test as requiring the employee to prove that the employer knew that, because of the exact danger posed, the employee would be harmed or was substantially certain to be harmed in some manner similar to the injury the employee sustained. Yarnell v. Klema Bldg., Inc. (Dec. 24, 1998), Franklin App. No. 98AP-178.
 {¶ 17} Appellants' first argument concerns the lack of a supplemental safety lock on the coupler and CGC's use of the coupler without the supplemental safety lock. The coupler's locking mechanism involves a locking plate that, using hydraulic pressure, slides behind the pin of the bucket, wedges the pin tight, and holds it in place. The locking mechanism is operated by a toggle switch inside the excavator cab. As originally manufactured, the sole locking mechanism on JRB Slide-Loc couplers consisted of this locking plate. However, in 1998, JRB introduced a second generation of Slide-Loc couplers, which incorporated a supplemental safety lock. The supplemental safety lock consists of a pin, manually inserted through a hole in the locking plate after the primary locking mechanism is engaged, which prevents the locking plate from retracting. The primary locking mechanism on second generation JRB couplers is identical to the locking mechanism on first generation JRB couplers.
 {¶ 18} Although it is possible to retrofit first generation JRB couplers with supplemental safety locks, first generation JRB couplers with no supplemental safety locks remained in use at the time of Ford's accident. After the introduction of its second generation couplers, JRB did not issue a recall of first generation couplers and did not instruct owners of first generation couplers to install supplemental safety locks. Further, neither the Occupational Safety Health Administration ("OSHA") nor the National Institute for Occupational Safety and Health ("NIOSH") has suggested that use of first generation couplers be discontinued or has required that couplers contain supplemental safety locks. In fact, Messineo was unaware of any regulation prohibiting the use of couplers without supplemental safety locks in 2002, and opined that, in 2002, it was reasonable to use couplers that did not have supplemental safety locks.
 {¶ 19} At some time prior to Ford's accident, the coupler at issue here had been equipped with a supplemental safety lock, although it is unknown whether the coupler was a second generation coupler, originally manufactured with a supplemental safety lock, or was a retrofitted first generation coupler. Regardless, at the time of Ford's accident, the coupler contained no supplemental safety lock. Appellants and CGC vigorously disagree as to whether CGC knew about the removal of the supplemental safety lock and, indeed, as to whether CGC was responsible for removing the supplemental safety lock. Although all CGC witnesses denied knowledge that a supplemental safety lock had been removed from the coupler, the record contains testimony that the supplemental safety lock was present when Columbus Equipment leased the coupler to CGC in May 2002. Additionally, the JRB Operator's Handbook and decals for the coupler refer to a supplemental safety lock, and Storts and CGC foreman, William Redoutey, saw a hole in the location where a supplemental safety lock pin would exist upon their inspection of the coupler two weeks before the accident. Given our other findings in this matter, we conclude that the issue of when and by whom the supplemental safety lock was removed is irrelevant.
 {¶ 20} It is undisputed that first generation JRB couplers with no supplemental safety locks remained in use at the time of Ford's accident, and appellants' expert witness conceded that use of such couplers was reasonable. Columbus Equipment's service mechanic, Gary Collins, testified that the supplemental safety lock was not essential to the safety of the coupler and that he had never known a bucket to detach if the primary safety lock was engaged. Similarly, Ray Fatemi, a former JRB project engineer, explained that "a supplemental lock is only useful when a primary lock has failed, and then in that case it would prevent unintentional unlocking of the coupling mechanism." (Fatemi Depo. at 20.) According to Fatemi, failure to use a supplemental safety lock on a second generation coupler would not compromise the safety of the whole system unless the primary locking mechanism failed. Todd M. Perrine, an expert witness testifying on behalf of CGC, testified that a JRB coupler without a supplemental safety lock is "a safe coupler" and that the specific coupler at issue here was in "[g]ood, working, safe condition" at the time of Ford's accident. (Perrine Depo. at 46, 140.) An inoperable supplemental safety lock on a second generation JRB coupler would not dissuade Perrine from recommending continued use of the coupler.
 {¶ 21} Even if the coupler at issue here was a second generation coupler, with its supplemental safety lock removed, the primary locking mechanism of that coupler is identical to the primary locking mechanisms of first generation JRB couplers, still reasonably used in the field without supplemental safety locks at the time of Ford's accident. Given the lack of a recall on JRB first generation couplers, the lack of any requirement that first generation couplers be retrofitted with supplemental safety locks, and the lack of any regulation prohibiting the use of couplers without supplemental safety locks, we conclude that CGC's use of the coupler without a supplemental safety lock does not create a genuine issue of material fact as to CGC's knowledge that injury to Ford was a substantial certainty.
 {¶ 22} We next turn to appellants' contentions regarding the procedures used to: (1) attach the bucket; and (2) test the attachment. As to the first issue, appellants argue that Storts failed to properly attach the bucket in accordance with JRB's instructions, thus creating a dangerous condition in CGC's business operation. As to the second issue, appellants argue that Storts failed to properly check the attachment, thus creating a dangerous condition in CGC's business operation. Messineo opined that CGC was aware that the process Storts used to attach the bucket, including Storts' test of the attachment, created a substantial certainty of harm to Ford. Upon review of the evidence in the record, we find Messineo's legal conclusion lacks an evidentiary basis for support, and we are thus compelled to reject it. SeeDuncan v. Mosser Constr., Inc., Lucas App. No. L-04-1364,2005-Ohio-4020.
 {¶ 23} Appellants argue that CGC's use of the coupler in contravention of JRB's instructions demonstrates CGC's knowledge that injury to Ford was substantially certain to occur. The JRB Operator's Handbook for the coupler and JRB decals attached to the interior of the excavator cab explain JRB's instructions for locking and unlocking the coupler. In the coupler product manual, JRB warns that not following the instructions for locking and unlocking the coupler, as set forth in the Operator's Handbook, presents a "high probability of personal injury." (David Boggs Depo., Exh. 1, at 3, 10.) Part of the JRB instructions require the operator to shut off the excavator, exit the cab, and manually engage the supplemental safety lock. After this step, the Operator's Handbook states:
 ! DANGER
 Make sure coupler is attached correctly to attachment. The supplemental lock can be engaged with the attachment in an incorrect lock position. A visual check is required each time lock operation is performed. * * *
 Do not operate attachment when supplemental lock is the primary locking device. Doing so could cause failure of the coupler.
 {¶ 24} Safety engineer, Robert Burch, testified that safe practice requires following the manufacturer's instructions for use of the coupler. Expert witnesses Gary Derian and Messineo testified that Storts deviated from JRB's recommended attachment procedure by not utilizing a supplemental lock and not visually inspecting the locking plate. Derian also opined that Storts did not rotate the bucket to a full curl position before moving the toggle switch from unlock to lock. Of particular importance to Derian was Storts' failure to make a visual inspection of the locking plate. Derian stated: "If you can visually inspect that plate and see that it is completely locked where it belongs, that is a very strong indicator that it is properly locked." (Derian Depo. at 20.) Derian opined that Storts' compliance with the JRB attachment procedures would have prevented Ford's accident, with or without the supplemental safety lock.
 {¶ 25} Expert witnesses Perrine, Derian, and Messineo all testified as to the importance of visually inspecting the attachment as part of a mandatory safe attachment procedure. Messineo opined that a visual inspection immediately prior to Ford's accident would have revealed that the coupler's primary locking mechanism was not properly engaged. Fatemi also explained "[w]e always ask operator to do a visual check and inspection, regardless of what coupler it is" and whether or not the coupler has a supplemental safety lock. (Fatemi Depo. at 51.)
 {¶ 26} Although Storts agreed that it is good safety practice for an operator to follow the procedures outlined in the operator's manual for the equipment he is operating, Storts' attachment procedure undisputedly deviated from JRB's proscribed procedure. Although Storts provided little testimony regarding the procedure he utilized in attempting to actually attach the bucket, Storts obviously did not engage a supplemental safety lock and admittedly did not visually verify the attachment. In fact, Storts stated he would not normally look to see whether the lock was in place after he moved the toggle switch inside the cab to the locked position. CGC's equipment manager, Richard Coogan, and CGC's Safety Director, Al Tambini, testified that they did not expect operators to always follow the manufacturer's instructions for coupler use.
 {¶ 27} Although CGC used the coupler without a supplemental safety lock and did not require its operators to unequivocally follow the manufacturer's instructions when locking and unlocking the coupler, CGC required its operators to conduct a safety check procedure, separate from the attachment procedure itself, to test the coupling after each attachment to ensure proper and complete engagement of the primary locking mechanism. CGC took its safety check procedure from installation instructions for a JB Quick Coupler manufactured by Hendrix, but CGC required its operators to perform the procedure after each attachment, regardless of the brand of coupler they were using. Coogan explained the two-step safety check procedure:
 Basically what we call the safety check procedures, where we would — What our operators do was to jack the machine off the ground once the bucket has been locked up, put the front of the machine off the ground and try to roll the bucket out of the — or roll the bucket in the dump position. And if the bucket is unlocked at that time, it will roll right out of the bucket. If it is hooked up, it ought to raise the machine and it tells you you got a good lock.
 * * *
 * * * [Step one] actually got the tracks up in the air and you had the whole weight of that machine on it. And then the second step was to curl the bucket or unload it in the dump position. Which while it was on the ground if that mechanism was unlocked it would roll right out of the bucket because you would have had your weight of the machine on it.
(Coogan Depo. at 61-63.) Witnesses alternatively refer to this procedure as a "ground test" or "pressure test."
 {¶ 28} Although not included in the JRB instructions for locking the coupler, JRB engineer Fatemi testified that it is "also a good idea to do a ground test" after attaching the coupler and visually inspecting the attachment. (Fatemi Depo. at 51.) JRB mechanic Boggs likewise acknowledged the pressure test as a means to ensure that the coupler is locked. Although Boggs criticized CGC's application of the Hendrix test to JRB couplers, he acknowledged that, upon performance of that test with any brand of coupler, a bucket would probably fall off if it was not properly locked. Fatemi likewise testified that, although he believed the Hendrix test was poorly written and confusing, if an experienced operator was not confused by the test and paid attention, performance of the test would reveal any problem with the attachment. Appellants' own expert, Messineo, did not contest the effectiveness of the CGC-required test for checking engagement of the coupler's primary locking mechanism and, indeed, agreed that, if Storts had performed the test required by CGC, he would have been aware of whether the primary lock was properly engaged.
 {¶ 29} Because it required operators to test the lock after each coupler attachment, CGC could reasonably anticipate that any failure in the attachment procedure itself, including deviations from the manufacturer's instructions, would be revealed and corrected upon performance of the safety test, without injury. While there is some dispute as to whether Storts properly performed the required testing procedure, we find no evidence in the record upon which a trier of fact could conclude that CGC knew that Storts was not properly performing the required test. Rather, both Redoutey and CGC operator, Joe Bing, testified that Storts was meticulous about performing the safety test after each attachment. Accordingly, we conclude that reasonable minds could not conclude that Ford's injury was substantially certain to result from CGC operators not following the manufacturer's instructions for locking and unlocking the coupler or not following CGC's required testing procedure. While the evidence arguably establishes that CGC may have acted negligently in failing to require its operators to comply with JRB's operating instructions, the evidence does not rise to the level of substantial certainty required to satisfy the standard for maintaining an employer intentional tort claim.
 {¶ 30} Even if it were probable that injury would occur if an employee was exposed to a danger enough times, we have previously held that "`there is a difference between probability and substantial certainty.'"Heard v. United Parcel Service (July 20, 1999), Franklin App. No. 98AP-1267, quoting Ruby v. Ohio Dept. of Natural Resources (Dec. 3, 1992), Franklin App. No. 92AP-947. In Goodwin v. Karlshamns USA,Inc. (1993), 85 Ohio App.3d 240, this court reviewed a trial court's entry of summary judgment in favor of the employer on an employer intentional tort claim and found that the plaintiff-employee failed to demonstrate a genuine issue of fact as to the second prong of theFyffe test, despite the employer's knowledge of a significant potential for injury. In Goodwin, the employer knew of a faulty vent on its plant roof, which ultimately caused a hydrogen gas explosion in an interior tank, seriously injuring the plaintiff. In addition to its knowledge of the faulty vent, the employer knew of the significant potential for a hydrogen gas explosion. In affirming summary judgment in favor of the employer, we noted the harshness of the Fyffe test and held, "a showing of a significant risk of an explosion does not constitute a showing that an explosion was a substantial certainty." Id. at 246. Likewise here, the evidence does not constitute a showing that injury to Ford was a substantial certainty.
 {¶ 31} In further support of their contention that CGC was aware that injury to Ford was substantially certain, appellants point to evidence of CGC's failure to train Storts regarding safe operating procedures for the coupler, OSHA's citation of CGC for failing to follow JRB's operating instructions, and CGC's knowledge of other bucket detachment accidents. We find that such evidence does not demonstrate a genuine issue of material fact as to whether CGC had actual knowledge that Ford was substantially certain to suffer injury.
 {¶ 32} In response to appellants' argument that CGC failed to train Storts regarding safe coupler operation, CGC argues that Storts was a journeyman operator[1] with a long history of operating excavators and couplers and that there is no evidence suggesting that Storts was untrained in attachment procedures. Coogan testified that CGC hires only journeymen operators and requires its operators to familiarize themselves with the equipment they are running. Tambini assumed, based on Storts' experience, that Storts would be familiar with the JRB Operator's Manual for the coupler. Storts was an experienced excavator and coupler operator with over 30 years experience operating heavy machinery in the construction industry, including prior experience operating both Komatsu excavators and JRB couplers. For six to eight years prior to Storts' work for CGC, his primary responsibility had been operating excavators, half of which time involved operating excavators with couplers. Moreover, Storts successfully operated the excavator and coupler at issue here for many hours over the course of two to three weeks before the accident. Storts had never before experienced a bucket unexpectedly detach from a coupler. Even if we were to assume that CGC failed to train or inadequately trained Storts, that failure would constitute negligence or recklessness, but it would not rise to the level of substantial certainty of harm. See Teal v. Colonial Stair Woodwork Co., Fayette App. No. CA2004-03-009, 2004-Ohio-6246, at ¶ 22.
 {¶ 33} Appellants next argue that CGC personnel's awareness of prior bucket detachment accidents resulting in injury or death demonstrates CGC's knowledge that injury to Ford was substantially certain. It is undisputed that CGC personnel, including Redoutey, Tambini, and Coogan were aware of prior accidents involving unexpected bucket detachments at other construction companies, including at least two bucket detachments at Performance Site Management, while Redoutey was employed there. Appellants also cite two 2004 publications by OSHA and NIOSH. The NIOSH publication addresses deaths associated with excavators between 1992 and 2000, whereas the OSHA publication reports 15 bucket detachments between 1998 and 2004, eight of which resulted in death.
 {¶ 34} This court has noted that "prior accidents resulting from the hazard are probative of whether an employer knows that an injury is substantially certain to occur[.]" Berge at 309, citing Foust v. MagnumRestaurants, Inc. (1994), 97 Ohio App.3d 451. While evidence of prior similar incidents is not dispositive of whether the employer knew that injury to an employee was substantially certain, it is one fact to consider in assessing the employer's knowledge. Goodin at 220. We have also noted that "`[establishing the employer's knowledge of substantial certainty of harm is difficult where there are not prior accidents of a similar character[.]'" Id. at 221, quoting Taulbee v. Adience, Inc., BMIDiv. (1997), 120 Ohio App.3d 11, 20.
 {¶ 35} In Heard, this court affirmed summary judgment in favor of an employer despite evidence of multiple similar accidents within the employer's own business operation. There, the plaintiff was struck on her head and right shoulder by a package that fell from an overhead conveyer belt and slide system at a UPS facility. UPS knew that its employees had previously been injured in this manner, as evidenced by eight injury reports from the previous two years. Expert testimony indicated that the overhead conveyer belt and slide system was a dangerous instrumentality. However, this court held that, "while evidence that packages have fallen and injured employees in the past indicates that such injuries will possibly or even likely occur in the future, it does not constitute a showing that Heard's injury was substantially certain to occur." Id.
 {¶ 36} Here, the undisputed evidence establishes that no unexpected bucket detachment had ever previously occurred within CGC's business operation. Moreover, the record reveals no evidence of any prior unexplained bucket detachment involving a JRB coupler, either with or without a supplemental safety lock. In fact, Redoutey testified that no cause was identified for the detachments at Performance Site Management.
 {¶ 37} CGC used the coupler at issue here for more than 500 hours over the four months prior to Ford's accident with no apparent problems. Storts, himself, used the coupler 40 hours a week for two to three weeks before the accident and estimated that he changed attachments 15 to 20 times a day. Prior to Storts' use of the coupler, CGC operator, Richard Crooks, used the coupler from May 20, 2002, through August 27, 2002, with no problems. Neither the existence of other bucket detachment accidents involving non-JRB couplers outside of CGC's business operation nor CGC's knowledge of such accidents creates a genuine issue of material fact as to whether CGC knew that injury to Ford was substantially certain. Furthermore, appellants' reliance on the OSHA and NIOSH publications is misplaced, given that such studies were not published until 2004, two years after Ford's accident. Accordingly, such publications have no bearing on CGC's knowledge of substantially certain harm prior to Ford's accident.
 {¶ 38} We further find unpersuasive appellants' argument that a disputed OSHA citation establishes CGC's knowledge that injury to Ford was a substantial certainty. The record contains an OSHA document entitled Citation and Notification of Penalty addressed to CGC and arising out of this accident. The Citation and Notification of Penalty sets forth citations for failing to follow the manufacturer's safe operating procedures for the coupler and for not ensuring that an employee working at a depth of six feet was protected from cave-ins either by properly sloping the trench or using a trench box. However, CGC disputes that OSHA ultimately cited it for failing to follow the manufacturer's instructions regarding coupler use. Tambini testified that "OSHA dropped the citation. They vacated the citation" for failing to follow the manufacturer's safe operating procedures. (Tambini Depo. I at 94.) Whether or not OSHA, in fact, cited CGC for its failure to follow the JRB instructions, we conclude that evidence of a citation, arising out of the accident at issue here, does not create a genuine issue of material fact as to CGC's knowledge that injury to Ford was substantially certain to result.
 {¶ 39} The Fourth District Court of Appeals has rejected an argument, similar to that raised by appellants, that an OSHA citation constitutes evidence that an employer knew that injury was substantially certain. InGoodin, the record contained evidence of a withdrawn OSHA citation for failing to provide appropriate monitoring devices for employees exposed to a gaseous environment. The appellant argued that the OSHA citation constituted evidence that the employer knew to a substantial certainty that harm would result to the decedent if he changed a leaking curb valve without an oxygen monitor while live natural gas was flowing through the line. While the employer's safety personnel did not approve of such a process, they knew that employees commonly engaged in the process and neither prohibited nor advised against it. However, the employer required at least one member of a crew to have an oxygen monitor on his person prior to entering an excavation. The Fourth Appellate District concluded that, although the OSHA citation may help establish that the employer was negligent, or perhaps even reckless, the citation was insufficient to establish that injury to the decedent was a substantial certainty. See, also, Duncan at ¶ 25 ("any claimed OSHA violations do not factor into our determination of whether Mosser knew that Duncan's injuries were substantially certain to occur"). Likewise, here, we conclude that the disputed OSHA citation does not create a genuine issue of material fact as to whether CGC knew that injury to Ford was a substantial certainty.
 {¶ 40} In conclusion, even if we were to find a dangerous condition in CGC's business operation, the evidence does not present a genuine issue of material fact as to whether CGC knew that harm to Ford was substantially certain to result. As the Ohio Supreme Court stated inVan Fossen at 117:
 There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an "intentional tort" * * *.
Although the risk of injury from an unexpectedly detached bucket may have been significant, and although CGC was aware of such risk based on JRB's warning and CGC's knowledge of injuries and deaths resulting from prior bucket detachments, CGC's knowledge and appreciation of the risk does not create a genuine issue of material fact that CGC knew to a substantial certainty that Ford would be injured. See Cox v. BarspliceProd., Inc. (June 15, 2001), Greene App. No. 2001-CA-1. While the evidence arguably establishes negligence by CGC, the probability of Ford being injured does not reach the level of substantial certainty, as required to survive summary judgment on an employer intentional tort claim. Upon review, we thus conclude that the trial court did not err in determining that appellants failed to demonstrate a genuine issue of material fact as to the second prong of the Fyffe test. Consequently, the trial court did not err in granting summary judgment in favor of CGC.
 {¶ 41} Because we find that the trial court did not err in granting summary judgment in favor of CGC on appellants' claims, we overrule appellants' sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER and TRAVIS, JJ., concur.
[1] Journeyman is the highest level of operator within the Operating Engineers Union.